## FRANCESCHINA, AN INFANT ETC., ET AL. *v.* HOPE, A MINOR

[No. 139, September Term, 1972.]

*Decided January 10, 1973.*

The cause was argued before BARNES, MCWILLIAMS, SINGLEY, SMITH, DIGGES and LEVINE, JJ.

*H. George Meredith, Jr.*, with whom were *Hymes, Keyes & Simmons* and *Jerome Piven* and *Bernard F. Goldberg* on the brief, for appellants.

*Phillips L. Goldsborough, III*, with whom were *Howard G. Goldberg* and *Smith, Somerville & Case* on the brief, for appellee.

BARNES, J., delivered the opinion of the Court.

The appellants, Peter Franceschina, an infant then three years of age, and his parents, Louis and Helen Franceschina, were plaintiffs below in the Circuit Court for Howard County (Wray, J.) in an action to recover damages for personal injuries suffered by the infant plaintiff and medical expenses and loss of earnings by the parents, allegedly resulting from the negligence of the appellee, Anne Victoria Hope, a minor then 14 years of age, in connection with a fall of the infant plaintiff from a mare, Taffy, under the control of the defendant, and a kick by the mare to the infant plaintiff's head. The jury found a verdict for the defendant and from the resulting judgment for her for costs, the plaintiffs filed a timely appeal to this Court.

The appellants contend before us that the lower court erred (1) in refusing to admit into evidence certain expert testimony in regard to horsemanship from two witnesses called by the plaintiffs; (2) in failing to grant an

instruction requested by the plaintiffs in regard to the absence of contributory negligence by the parents; and, (3) in giving instructions allegedly "slanted" in favor of the defendant. We have concluded that the lower court committed no reversible error and we will affirm the judgment for the defendant for costs.

Anne, the 14½-year-old defendant, on June 1, 1968, decided to go horseback riding with a friend, Julie Myers, to the 7-11 store in Columbia, Howard County. The two girls got Taffy, a mare owned by George V. Hope, Anne's father, out of her stall, placed a bridle on her, and rode bareback to the store where they each had a "slurpy." On their return home, they went through a baseball field where a number of children were playing. Seeing the mare, several of those children ran over to the girls and requested a ride on Taffy. Anne agreed to give them a ride because, as she testified, "it would be a nice thing to do."

Anne further testified that on previous occasions at her home in Columbia, she had given other children rides on Taffy without incident. All of the witnesses who had any experience with Taffy agreed that she was a very tractable, well-mannered mare who had never injured anyone. Julie stated that Taffy was a good riding mare, was quiet and calm and had no bad habits. She had never had any difficulty in riding or controlling the mare. Anne testified to the same effect, stating that Taffy responded well to hand and leg commands and that the mare never bucked, kicked or shied and was not difficult to handle. Her father George gave similar testimony.

Peter, the infant plaintiff and his friend, Jon C. Meyers, were among the children requesting a ride on the day of the accident. Peter testified that the girls asked him if he wanted a ride; but Jon, the two girls, Anne and Julie, as well as Vicki Everhart, all testified that Peter first asked for a ride on Taffy. In any event, Peter and Jon were placed on Taffy—Peter and Jon stating that Peter was placed in front and Jon behind him; Anne and

Julie testifying that Peter was placed behind Jon. Anne testified that Jon held onto the lower part of Taffy's mane which at that point was approximately four inches long; Peter sat behind with his arms around Jon's waist. Anne stood alongside of Taffy's neck and held the reins just under the bit in her left hand, so that she could control the mare's movement and placed her right hand on the upper legs of the children near their hips in order to help steady them. Both Peter and Jon testified that no one was holding Peter's leg.

Anne then led Taffy around in a circle, walking alongside Taffy. As she did this, one of the little boys began to slip. Anne brought Taffy to a halt and tried to grab the boy's leg to keep him on the horse, but both boys slipped off. At the same time, Anne called to Julie for help. Peter fell in the vicinity of Taffy's hind feet; the horse kicked, the hoof of one of her hind legs striking Peter's skull and injuring him.

Anne, called by the plaintiffs to testify as an adverse party, testified at some length in regard to her experience with horses. She (and her father George) testified that she had been riding since she was nine years old—some five years prior to the accident. George had taught her a little about riding and she had learned some other things from other persons. For the most part, she learned by experience. Anne had never received any professional training and had never attended a riding school. She stated her understanding of horsemanship, including the manner a horse is controlled by a rider, with particular emphasis upon the use by a rider of legs and feet for control. She also testified concerning her understanding in regard to the manner in which a young child could keep his or her balance upon a horse by using a horse's mane to hold onto, the purpose and use of a saddle, the movement of a horse's back while the horse was in motion, and generally in regard to the physical interplay between horse and rider. She was questioned at length in regard to her experience and her under-

standing as to how one would normally prevent young children from falling from a moving horse while riding bareback, as well as in regard to her understanding as to any risk of falling which might be involved.

The plaintiffs also sought to introduce the testimony of certain expert witnesses. We will mention this testimony later in this opinion when we consider the first question presented to us by the appellants.

Helen Franceschina, Peter's mother, testified in regard to her activities, as well as those of Peter prior to the accident; but she did not witness the accident. We find nothing in the record to indicate that the defendants claimed that Helen had been guilty of contributory negligence, nor was any argument made to the jury to that effect.

In returning the verdict of the jury, the foreman stated, "We find the defendant not guilty of negligence," and the clerk stated, "Ladies and gentlemen, hearken to your verdict as the Court hath recorded it. Your foreman says you find for the defendant, and so say you all?" The jury answered, "We do."

## (1)

In considering whether the lower court committed reversible error in declining to admit into evidence the proffered testimony of three expert witnesses in regard to horsemanship, it should be kept in mind that the admissibility of expert testimony generally is within the discretion of the trial court. See *Nizer v. Phelps,* 252 Md. 185, 193, 249 A. 2d 112, 117 (1969) ; *State, Use of Stickley v. Critzer,* 230 Md. 286, 289-90, 186 A. 2d 586, 588 (1962) ; *Shivers v. Carnaggio,* 223 Md. 585, 588, 165 A. 2d 898, 900 (1960).

The party challenging on appeal the ruling of the trial court in regard to the admissibility of expert testimony has the burden of showing an abuse of the trial court's

discretion. *See Shivers v. Carnaggio*, 223 Md. at 591-92, 165 A. 2d at 902.

In this legal setting, we now turn to the relevant facts in regard to the testimony of the experts proffered by the plaintiffs.

The first expert witness was Philip Lynch, who had been head of the riding department of McDonogh School for some 32 years. He was recognized as an expert in horsemanship. He testified that:

> "The usual thing for a horse to react to any foreign object, whether it be human or otherwise, under its back feet, is to get away from it, and they'll get away in whatever way is convenient for the horse. Either they'll go forward, sometimes they'll kick out, but in any case, they do not like to have their back feet encumbered."

Mr. Lynch, having heard Anne's testimony, was asked by counsel for the plaintiffs:

> "In your opinion, should a person of the age, training, background and experience of Anne Hope have anticipated an injury to the rider under the facts you have heard, those facts being small children, three and a half years old, bareback on a horse."

The objection of counsel for the defendants to this question was sustained by the trial court with the comment to the effect that it was the function of the jury and not of the witness to answer this question, it being tantamount to an inquiry of the witness as to whether, in his opinion, Anne had been guilty of negligence. There was no proffer of what Mr. Lynch's answer to the question would have been.

After Mr. Lynch had been excused from the witness stand, counsel for the plaintiffs made the following proffer:

> "Your Honor, the basis for this proffer, and the basis for the desire to have the testimony of the

expert placed into the record is on the basis that we are dealing with a special skill, that is, horseback riding, as distinguished from the normal activities of the everyday person. Our position is that, first of all, it may be, it may very well be, that members of the jury are not familiar with what precautions should be taken, if any, in horseback riding. We are, as the Court is aware, the testimony concerning this particular fourteen year old girl, is that she was fourteen years old, and had been riding for five years, approximately. She has been under the observance of not only her parents, who have permitted her to ride in the various fashions, saddled and unsaddled, and permitted her to, in their presence, permit children, small children, to ride bareback, single and double, and permitted her to go on her journey into Columbia on this particular day bareback with another girl. We believe it is necessary for the jury to know what the normal or basic standards of riding are. We believe through this witness we could show that he has taught, as he said, many children, something like a hundred and twenty-five a year in the school, a hundred and seventy-five in the summer time, up to a hundred and seventy-five in the summer time, that he would testify as to what knowledge a fourteen year old would have after five years of riding experience, that he would be able to testify as to what safety precautions should normally be known by a child of that age, fourteen years old, and whatever the minimal bases are for riding, whether or not it is safe to, first of all, put one child on a bareback horse, a child of three and a half years old, plus being a child, the experience of that three and a half year old being unknown to the owner of the horse, what safety precautions should be taken if one child is placed on a horse,

what added risks, if any, there are if two children are placed on a bareback horse, when the experience of neither of the two children are known to the owner of the horse, in this case treating the girl, Anne Victoria Hope, as the owner, whether or not it is prudent and a proper exercise of good judgment to place one—for a fourteen year old with the experience of five years of riding, to place any children of this age on a bareback horse, and also the minimum skills that would be necessary, or would be existent in a fourteen year old who has had five years experience. We think that this type of testimony—we know that this will be forthcoming from Mr. Lynch, our expert in this field, and he would tell, as I said before, the basic minimum requirements of riding and handling a horse when you have five years experience. He would also tell the requirements of, the knowledge and requirements of fourteen years old as to the handling of horses under these basic standard skills. It is our position that, we maintain that the minimum skills of this specified activity of riding are unknown to the jury, at least as far as this case is concerned, we have no knowledge that the jury, what, if anything, they know of riding, and also we feel that the jury does not know the requirements of a fourteen year old as to these basic skills. That's basically what our proffer is."

The trial court then stated: "Well, if I may define it briefly . . . I understand that you wish to prove the minimum skills of horsemanship, and leave it to the jury to decide whether or not this fourteen year old defendant should have met these minimum skills," and counsel for the plaintiffs replied, "That's correct, Your Honor."

The trial court concluded that expert testimony on the points mentioned was irrelevant to the issues in the case and lacked probative value.

The plaintiffs then called, as an expert witness, Mrs. Lynn Shpak, who had taught riding at camps or various professional schools for approximately 15 or 16 years. Her qualifications were not challenged. She testified, without objection, that one cannot really teach children "until they're six or seven. They don't have enough legs on them to be taught. You can give them a ride earlier than that. Generally most children come to you for serious lessons from seven on up." She also expressed the opinion that a "saddle is also necessary for a proper method of riding, as well as a safe one." She also stated:

> "A younger child must sit up on top of the horse totally by balance. They have no ability to use their legs as a method of gripping or as a method of controlling the horse. Therefore, there is no real purpose to teaching them any younger than that, because they are sitting there purely by balance."

> \* \* \*

> "The legs keep you on top of the horse. That's the only thing that keeps you from falling off."

Counsel for the plaintiffs then asked Mrs. Shpak in regard to whether she taught bareback riding, what precautions she used to avoid injury to children when they were learning to ride, whether the practices she used "to teach were accepted by experienced riders," and what the relationship was between a person's age and the ability to perform as a horseman. The trial court sustained objections to these questions, as well as to the question:

> "Do you have an opinion as to what is foreseeable to happen if anything is to happen, when a three and a half year old child is placed bareback—two three and a half year old children are placed bareback on a full grown horse?"

The plaintiffs had another expert—a Mr. Speeden—available but he was not used as a witness and no prof-

fer was made in regard to what his testimony was expected to be.

The facts in the present case do not involve the finer points of horsemanship about which possibly, in the automobile age, only few people could be thought to have knowledge and understanding. As the trial judge aptly observed in replying in chambers to a comment by counsel for the plaintiffs that the case was not one where someone was hurt while walking down a sidewalk, "neither is it a case where someone was hurt trying to jump a horse over a fence." Nor does the case involve a defendant who operated a riding academy or who was in any way a professional holding herself out to the public as possessed of special skills in horsemanship, where, possibly, expert opinion evidence in regard to the standard of care and skill ordinarily possessed by such a person could be of real appreciable help to the jury. The case involves a 14-year-old girl who thought it would be a nice thing to give a three-year-old boy and his equally young companion a ride on a gentle horse by walking the horse around in a circle. Anne had received no professional training in horsemanship. She was not teaching Peter how to ride a horse. The jury was quite able, in our opinion, to understand this simple factual situation, Anne's experience or lack of it, the shortness of the legs of three-year-old children, the movement of a walking horse under the control of Anne by use of the reins and her efforts to keep Peter on the horse when he began to slip off and his injury by Taffy's attempt to disentangle her hind feet from the colliding boy. The trial court could reasonably conclude—as it did—that under these circumstances, the proffered testimony of the experts, Lynch and Shpak, would not be of appreciable assistance to the jury. There was, therefore, in our opinion, no abuse of discretion by the trial court in excluding that proffered testimony.

The plaintiffs contend, however, that the trial court applied what they consider to be an outmoded rule of

law, *i.e.*, that experts will not be permitted to give their opinion on the very issue which the trier of fact must determine, which, they say, was disregarded by us in *Shivers v. Carnaggio, supra*. In *Shivers*, we held that a physician who was familiar with his patient and who understood the patient's activities and occupation should be permitted to express his opinion in regard to the extent to which the anatomical disability of the patient will cause personal or economic disability. In the course of our opinion in that case, we did clarify the *basis* upon which the sound discretion of the trial judge should be exercised in considering the admissibility of expert testimony. We stated:

> "Wigmore and McCormick agree that the test of admissibility of an expert's opinion should be whether his testimony will be of real appreciable help to the trier of fact in deciding the issue presented. 7 *Wigmore, Evidence* (3rd Ed., 1940), Sec. 1923: 'But the only true criterion is: On *this subject* can a jury from *this person* receive appreciable help?' *McCormick, Evidence*, Sec. 11: 'It is believed that the standard actually applied by the trial judges of today approaches more nearly the principle espoused by Wigmore [Vol. 7, 3rd Ed., Sec. 1918], namely that the opinion should be rejected only when it is superfluous in the sense that it will be of no value to the jury.' " (Emphasis in the original)
> 223 Md. at 588-89, 165 A. 2d at 900.

*Shivers*, however, should not be interpreted to mean that an expert witness may in his opinion on the facts include an opinion on a matter of law or upon the application of a rule of law to the facts of the particular case. We think Professor Edmund M. Morgan expressed it well in his book, *Basic Problems of Evidence* (1962) at 218:

"For example, the Supreme Court of Iowa has declared that wherever opinion testimony is proper, 'the witness may express his opinion either as to the possibility, probability, or actuality of the matter of fact about which he is interrogated and the answer will not be an invasion or usurpation of the function of the jury, even though it passes upon an ultimate fact which the jury must determine.'

*"But this does not mean that the witness may in the guise of opinion upon a matter of fact include in it a matter of law or the application of a rule of law to the facts.* As the Iowa Court said: 'No witness should be permitted to give his opinion directly that a person is guilty or innocent or is criminally responsible or irresponsible, or that a person was negligent or not negligent or that he had capacity to execute a will or deed or like instrument or . . . respecting whether a county attorney had probable cause to believe the plaintiff was guilty of the crime charged. But the reason is that such matters are not subjects of opinion testimony. They are mixed questions of law and fact. *When a standard or a measure or a capacity has been fixed by law, no witness whether expert or non-expert, nor however qualified, is permitted to express an opinion as to whether or not the person or conduct in question measures up to that standard.* On that question the Court must instruct the jury as to the law, and the jury must draw its own conclusions from the evidence.' " (Emphasis supplied)

In the questions addressed to Mr. Lynch and to Mrs. Shpak—already set out in full—in regard to whether Anne "should have anticipated an injury to the rider under the facts you have heard . . ." (small children three and one-half years old, bareback on a horse) or

"should have foreseen" what would happen under the same facts, we have illustrations of the type of questions which Professor Morgan indicates are not properly the subject of opinion evidence, expert or lay. Most certainly, there was no abuse of discretion by the trial court in sustaining the objections to those questions.

In *Fletcher v. Dixon,* 107 Md. 420, 434-35, 68 A. 875, 881 (1908), a horse was frightened by the noise from an automobile. Expert witnesses were produced by the defendant who was seeking to prove contributory negligence on the part of the female driver of the horse. The witnesses who were familiar with the horse for four or five years were asked whether, in their opinion, the horse was "fit for a lady to drive" or was "safe for a woman to drive." The trial court sustained objections to these questions. Our predecessors indicated that these rulings were correct inasmuch as the jury was able itself to make this determination without the aid of expert testimony. Chief Judge Boyd, for the Court, stated:

> "The witnesses, whether experts or not, could give their knowledge of the horse and its traits, but the jury could judge as well as they could whether it was safe for the plaintiff to drive this particular horse, without having the opinion of witnesses on the subject."
> 107 Md. at 435, 68 A. at 881.

Finally on this subject—and not without irony—the plaintiffs were able to put into evidence *without objection* much of the expert testimony of Mrs. Shpak in regard to the movement of a horse's back while walking, the insufficiency of length and strength of the legs of a three-year-old child to grip the body of a horse effectively and the necessity of such a child to sit on a horse by balance and to use whatever is available to such a child to hold onto the horse. Although, as we have indicated, the trial court could reasonably have concluded that such evidence would be of no "real appreciable help" to the

jury on the issue in this case, inasmuch as this portion of the expert testimony came in without objection and was fully before the jury, it is difficult to see how the plaintiffs were prejudiced by other exclusions of similar testimony to which objection was made. *See Air Lift, Ltd. v. Board of County Commissioners of Worcester County,* 262 Md. 368, 400-401, 278 A. 2d 244, 261 (1971).

## (2)

The plaintiffs requested the trial court to include in its instructions to the jury an instruction that the "adult plaintiffs were not guilty of contributory negligence" and duly excepted to the trial court's refusal to give this instruction to the jury.

As we have already stated, there was no claim by the defendants that the adult plaintiffs were guilty of contributory negligence and the record does not indicate any argument or contention made to that effect. Under these circumstances, no such instruction would have been proper and, indeed, the giving of such an instruction might well have confused the jury by seeming to consider a question not raised or argued in the case. *See Bull Steamship Lines v. Fisher,* 196 Md. 519, 529, 77 A. 2d 142, 148 (1950). And see Maryland Code (1969 Repl. Vol.), Art. 75, § 2.

In addition, the verdict of the jury finding that the defendant "was not guilty of negligence" shows that the verdict in the defendant's favor was predicated upon the absence of *primary negligence* on her part and not upon any consideration of contributory negligence on the part of the adult plaintiffs. There was obviously no prejudice to the plaintiffs resulting from the refusal to grant the requested instruction. *See Shivers v. Carnaggio, supra.*

## (3)

Finally, the plaintiffs contend that the trial court's instructions on liability were "slanted" in favor of the defendant and this resulted in prejudice to them.

The argument is that there was undue emphasis in the charge upon the defenses available to the defendant because of her minority. Moreover, they say, the instructions emphasize the negative in stating, for example, "If you *do not believe* that Anne was guilty of negligence or if you *do not believe* that her negligence was the direct cause of the accident, then your verdict will be for her." The argument is that no alternative proposition expressed in positive terms was given.

We have reviewed the trial court's charge and taking it as a whole we perceive no "slanting" of the charge in the defendant's favor. The trial court carefully and correctly instructed the jury in regard to the obligation of Anne to exercise ordinary care and further that the jury should consider whether Anne "should have foreseen that what would happen was likely to happen. This does not mean that she must have foreseen the exact way the accident occurred, to be negligent, but only that she should have appreciated that an injury was likely to occur to Peter." In our opinion, the charge as a whole was proper and presented no reversible error. *See Hartman v. Meadows*, 243 Md. 158, 163, 220 A. 2d 555, 557 (1966).

> *Judgment affirmed, the appellants to pay the costs.*