709 A.2d 1316

Timothy Lorne MASSIE, Sr.

v.

STATE of Maryland.

No. 85, Sept. Term, 1997.

Court of Appeals of Maryland.

May 26, 1998

George E. Burns, Jr., Asst. Public Defender (Stephen E. Harris, Public Defender, Julia Doyle Bernhardt, Asst. Public Defender, on brief), Baltimore, for petitioner.

Devy Patterson Russell, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER, WILNER and CATHELL, JJ.

RODOWSKY, Judge.

In this certiorari review of a conviction for murder the issue is whether the trial court abused its discretion in permitting a forensics employee of the investigating police department, who was not a doctor of medicine, to opine as to the time of the victim's death.

The petitioner, Timothy Lorne Massie, Sr. (Massie), was convicted by a jury in the Circuit Court for Washington County of second-degree murder and sentenced to thirty years imprisonment. That judgment was affirmed by the Court of Special Appeals in an unreported opinion.

The victim was Massie's estranged wife, Debra Massie (Mrs. Massie). The murder was committed sometime on February 14 (Valentine's Day) in 1995. It was undisputed that the cause of death was strangulation and that Mrs. Massie was killed where her body was found, in the living room of the residence at 311 Jefferson Boulevard in Hagerstown where she resided with the Massies' twin, eight year old sons. Prior

to the Massies' separation, the premises were the marital abode. To the rear of the dwelling house was a garage which Massie, the owner of a towing service, and his employees continued to use occasionally for the maintenance and repair of the tow trucks which were principally garaged elsewhere. Following the Massies' separation the dwelling house was "off limits" to Massie and his employees.

Mrs. Massie was last seen alive by her stepmother at the latter's home when Mrs. Massie dropped off valentines between 11:00 a.m. and 11:15 a.m. on February 14, 1995.

On the day of the murder one of Massie's employee's, Daryl Moser (Moser), was working on a tow truck in the garage. He had arrived there between 11:00 a.m. and 11:15 a.m. He did not see Mrs. Massie at any time that day. Moser testified that Massie arrived at the garage between 11:15 a.m. and 11:30 a.m., remained for approximately ten minutes, and left. At 11:45 a.m., Moser heard a truck pull up to the garage. When no one entered, Moser looked outside and saw Massie inside the fenced-in yard of the dwelling, walking toward the rear of the house. Massie signaled to Moser that he would be back in a minute or two, and Moser went back to work. Five to eight minutes later, Massie returned from the house, had a two- to five-minute conversation with Moser in the garage, and drove off. Some time after Massie had left, a call came in from Massie's mother over the radio in the tow truck, "hollering for Tim." Moser looked at the truck's clock which, he recalled, read approximately 12:30 p.m.

At approximately 12:15 p.m. on February 14, 1995, Sergeant Richard C. Moyer (Moyer) of the Washington County Sheriff's Department telephoned Massie about some vehicles which Massie's company had towed at the request of the Sheriff's Department and which were stored at 30 Baltimore Street in Hagerstown. Moyer reached Massie's answering service, and Massie returned the call approximately ten minutes later. He sounded agitated. During that telephone conversation, Massie reported that wheels and tires had been stolen from one of the

stored vehicles. Moyer advised Massie to speak with the Hagerstown police.

At 1:13 p.m., Sergeant William C. Wright, III (Wright) of the Hagerstown Police Department responded to the reported theft. He arrived at the storage lot at 30 Baltimore Street at 1:18 p.m. and was met by Massie. Wright remained with Massie until approximately 1:50 p.m., when Massie went to the Hagerstown Police Station. Four officers, as well as the front desk receptionist, testified that Massie was at the police station from approximately 2:00 p.m. until 2:30 p.m.

Mrs. Massie had not appeared at the Valentine's Day party that began at 12:45 p.m. at her sons' school. After school the boys were unable to gain entry to their home. They asked Moser if he knew where their mother was. Moser went to the back door of the Jefferson Boulevard residence and noticed broken glass by the knob. Moser knocked on the door and yelled inside for Mrs. Massie, but received no reply. He then took the Massie children to their grandparents' house that was nearby. From there he telephoned Mrs. Massie, but received no answer. After attempting unsuccessfully to contact Massie, Moser returned to the Jefferson Boulevard residence, reached through the broken pane, and opened the door. Moser discovered Mrs. Massie's body and immediately telephoned 911.

Community Rescue Service received that emergency call at 3:21 p.m. and promptly dispatched two paramedics who arrived at the murder scene approximately two minutes later. Randolph Scott Spies (Spies), one of the paramedics, testified on cross-examination that Mrs. Massie had been dead for "well over an hour" before he arrived. On redirect, Spies said that he could not specify by how much more than an hour the body had been dead. It was cool, but not cold. Spies's concern was whether to initiate resuscitation, which he did not attempt.

The witness with whose testimony we are concerned is Jeffrey Craig Kercheval (Kercheval), a forensic chemist with the Hagerstown Police Department. He arrived at the crime

scene at approximately 4:05 p.m., conducted a brief walk-through of the premises, and at about 4:15 p.m. made an examination of the victim which is more particularly described, *infra*. The trial court permitted Kercheval to express, over objection, the opinion that Mrs. Massie had been dead for as long as five hours, *i.e.*, from 11:15 a.m. at the earliest. Massie claims that that ruling was erroneous.

Dr. Edward Ditto, III (Ditto), the Deputy Medical Examiner for Washington County, arrived at the scene shortly after 5:00 p.m. Ditto concluded that Mrs. Massie died at approximately 2:30 p.m. He recorded that as the time of death in his official report. Later, Ditto told the defense investigator that the time of death was 2:30 p.m., "give or take fifteen minutes." At trial Ditto testified that he was told by an unidentified officer at the crime scene that Massie had visited his wife there at about 2:00 p.m. Ditto took that information into account in his reported time of death. Having since learned that that information was not correct, Ditto testified that death could have been as early as 12:15 p.m., although he acknowledged that his examination of the body was also consistent with death having occurred at 2:15 p.m.

Dr. Dennis Chute, the forensic pathologist who performed the autopsy on Mrs. Massie in Baltimore, recorded in his report that the time of death was 2:30 p.m. He was not asked any questions about the time of death.

The State's theory of the case was that Massie murdered his wife and attempted to make it appear that the murder was committed by an intruder. Further, there was evidence from which the jury could have found that Massie's motive was to avoid transferring an anticipated one-half of the value of his business and of the Jefferson Boulevard property to his wife in their divorce which Massie was anxious to conclude in order to marry another woman.

The evidence linking Massie to the murder included the following. Kercheval found a note on the television set at the crime scene which read: "Your husband is next, I need money." That note was written in ink that matched the ink in

a pen taken from Massie. The pen was a counterfeit Cross pen that had a very rare type of ink, thus substantially increasing the likelihood that Massie's pen was the one used to write the note. Further, a cigarette butt, found in the trash can in the kitchen at 311 Jefferson, carried DNA that matched Massie's DNA. Glass on a hammer recovered by Kercheval and glass fragments from blue work pants belonging to Massie were "optically indistinguishable" from the glass in the kitchen door's broken window pane. This type of glass was different from ninety-one percent of the glass in the FBI's data base.

In addition, the murderer had taken Mrs. Massie's pocketbook. Thereafter Massie asked Moser whether he had noticed that the purse was missing, but a detective testified that this information was not made known to Massie or to the public. There was also evidence that Mrs. Massie carried in her purse an address book that contained the unlisted telephone number of a longtime friend of Mrs. Massie. That friend testified that, after the murder, Massie telephoned her on her unlisted line.

Massie did not testify at trial. The defense strategy was to generate a reasonable doubt based on the fact that Massie was at the police station when, according to Dr. Ditto's report, Mrs. Massie was being strangled.

Against the foregoing background we now turn to the issue before us. The question presented in Massie's petition for certiorari reads:

> "Did the trial court err in concluding that, although a witness was not an expert in pathology and could not give an opinion as to time of death, the witness could give 'his opinion the time of death was somewhere between the time of his arrival and two hours before ... six hours before'?"

The phraseology of the question presented reflects the evolution of the trial judge's analysis that led to the disputed admission of Kercheval's opinion.

The Court of Special Appeals described the witness's general qualifications as follows:

"Kercheval received an Associates of Arts degree from Hagerstown Junior College and a Bachelors of Science degree with a major in Biology from St. Mary's College in Maryland. He earned a Masters degree in forensic science from George Washington University and did post-graduate studies in toxicology from American University. He has been the forensic chemist for the Hagerstown Police Department for approximately 11 years. He also teaches at Hagerstown Junior College instructing the Criminalistics curriculum. He instructs at the Western Maryland Police Academy, which is a police training academy of the Hagerstown Police Department. He has also instructed a forensic science seminar for the Mid–Atlantic Association of Forensic Scientists, a professional forensic scientist organization. He has completed the following training: the Maryland Law Enforcement Officers Occult New Age Beliefs School (on the investigation of the occult at crime scenes); the F.B.I. Crime Scene Protection and Evidence Preservation School; the Eastman Kodak Crime Scene Photography School; the F.B.I. Basic Footwear and Tire Print Evidence Class; the F.B.I. Basic Fingerprint Classification School; the Mid–Atlantic Association of Forensic Scientists Expert Forensic Testimony Workshop; the FBI's Advance Latent Fingerprint School; the United States Secret Service Questioned Documents Course; and the Mid–Atlantic Association of Forensic Scientists Advanced Training Techniques for Footwear and Tire Tread Impression Evidence. In 1993 he was bestowed the American Academy of Forensic Science award for outstanding service to the forensic sciences in the Mid–Atlantic Region of the United States. He also was the first recipient of the Remarkable Young Forensic Scientist Award by *Scientific Sleuthing,* an international forensic science magazine. He belongs to many boards and associations and work[ed] on some noted cases, but they are too numerous to mention."

Specifically with respect to establishing the time of a death, the intermediate appellate court accurately noted that

"Kercheval took a forensic pathology course at the Armed Forces Institute of Pathology at the Walter Reed Medical Center that dealt with determining [and] establishing time of death. The course Kercheval teaches at a local college includes a forensic pathology component.[3]

"[3]During this section, Kercheval teaches from the *Medical–Legal Investigation of Death*, which is, according to Kercheval, the gold standard for forensic pathologists. He also teaches from *Forensic Pathology*, by Demilo and Demilo and a handout on the topic created by the Violent Criminal Apprehension Program of the Federal Bureau of Investigation. Finally, he uses a synopsis of how to establish times of death by Dr. Patricia McKeely, who is the Chief Medical Examiner for New Mexico."

The State concluded its presentation of Kercheval's qualifications by asking, "Do you commonly utilize techniques as part of your investigation of a homicide or suspicious death to attempt to determine the approximate time of death?" Kercheval replied, "Yes I do." The State then proffered Kercheval as an expert "in forensic chemistry and as an expert in crime scene reconstruction." The defense had no objection, but Massie flagged for the court his anticipation that the State would try to elicit an opinion from Kercheval "regarding pathological issues" to which Massie would object. The court received Kercheval as an expert in forensic chemistry and crime scene reconstruction, noting, "That's what he's being offered for." The State replied, "At this time, yes sir."

The State examined Kercheval for better than fifty pages of transcript, eliciting the details of Kercheval's collection of physical evidence at the crime scene. The witness then described his examination of the victim's body. He felt the extremities for temperature and for the presence of rigor mortis. Without objection he explained that usually rigor mortis becomes apparent to the touch in about one hour after death and that a body "will reach maximum stiffness anywhere from six to twenty-four hours" after death. He explained the body chemistry causes of rigor mortis. In Mrs. Massie's body it was present in the extremities and in some of the larger muscles, but it was not yet fixed.

Kercheval then began to describe algor mortis, a method of estimating the time of death based on the temperature of the body. He stated that there are "different factors which affect all these different means that we try to establish time of death." At this point Massie objected and a bench conference ensued.

The court reiterated that Kercheval had not been accepted as an expert in pathology, but the State argued that, based on Kercheval's course work, the State was offering Kercheval "as an expert in this limited area," inferentially, time of death. The State disclaimed offering Kercheval as a doctor, but said: "I'm not going to use any expertise in this area of time of death ... pathology as it relates to the time of death." We read the pause in this statement to indicate that the State was revising its general disclaimer and limiting the disclaimer to "pathology as it relates to time of death."[1] The court responded that time of death is a medical question. The prosecutor countered by saying that Kercheval was qualified to testify as to his observations and that "I have not asked him for time of death."

The court agreed with the State's contention that Kercheval could testify describing "his observations as to what he has knowledge of...." Massie then pointed out that his objection went to "the onset of rigor, the time frame involved." The court disagreed, expressing the belief that "it" had something to do with forensic chemistry and the reconstruction of the crime scene. The court stated:

---

1. *Steadman's Medical Dictionary* (5th Unabridged Lawyer's ed.1982) defines pathology as

"[t]he medical science, and specialty practice, concerned with all aspects of disease, but with special reference to the essential nature, causes, and development of abnormal conditions, as well as the structural and functional changes that result from the disease processes."

The work lists fifteen types of pathology. It appears that the disputed ruling in the instant matter involved anatomical pathology, defined as:

"pathological anatomy; the subspecialty of [pathology] that pertains to the gross and microscopic study of organs and tissues removed for biopsy or during postmortem examination, and also the interpretation of the results of such study."

"I think he's qualified to testify if he observed signs of rigor mortis.

. . . .

"And what those signs mean and what it meant to him and what he observed."

Massie again objected to the "bootstrapping," but the court replied:

*"I think the witness can aid the jury in its determination as to the time of death.* But I don't think I would say the witness can give an opinion. I think that he can (inaudible) so that the jury can use that information together with all the other information[ ] that the evidence (inaudible). Assuming that there's (inaudible) as to perhaps not necessarily the exact time of death but a window that death probably occurred in this window of opportunity."

(Emphasis added).

At this point in the colloquy the State proffered that Kercheval would testify that death occurred approximately three to five hours prior to his examination at 4:15 p.m. The defense again objected on the ground that the Armed Forces Institute of Pathology course taken by Kercheval did not make him a pathologist. The court ruled that Kercheval, based on his observations and what it meant to him as a forensic chemist, could tell the jury "what in his opinion, if he has an opinion, that the death occurred within a certain . . . within a window of . . . a window of time."

Continued argument by Massie that Kercheval could not say Mrs. Massie was dead for three to five hours prior to his examination led to the statement by the court from which the question presented on certiorari was taken. The court said:

"I think that he can . . . I'm going to let him if the State wishes to proceed in this fashion, I'm going to let them through this witness I mean there's going to have to be other foundation but ultimately be able to say through this witness . . . to present to the jury information through this witness (inaudible) in his opinion the time of death was

somewhere between the time of his arrival ... and two hours before ... six hours before.

"I think that it would be helpful to the jury to hear his opinion based on all that he's done in this case. Ask him his experience. For the jury to get an expression from this witness as to the (inaudible) the outer limit of time involved (inaudible)."

The argument continued with the State advancing the following distinction:

"We're not talking pathology in terms of an autopsy. But we are talking about how it portrays at the crime scene and what he viewed with the body. These are niched areas of education and experience."

At that point the court flatly ruled that the State could ask the question: "What is the earliest time of death (inaudible) ... time of death of?" and that the court would overrule Massie's objection to that question.

Examination of Kercheval resumed. He explained algor mortis and the "Glaister equation," a formula for approximating the time of death based on rectal temperature. He admitted that, because he is not a medical examiner, he did not take a rectal temperature of Mrs. Massie. By touch he observed that her extremities were somewhat cool and that her abdominal region was slightly warmer than the room temperature.

Kercheval then explained livor mortis, also known as postmortem lividity, that is the purplish coloration in the area of the body where blood settles by gravity. He said that the onset of livor mortis is usually visible at around two hours and that it then becomes more intense. He said that "[p]ost mortem lividity becomes fixed somewhere around eight hours after death according to the texts." By being fixed he meant that the purple color would remain even after finger pressure was applied to the area. The postmortem lividity in Mrs. Massie was not fixed.

Kercheval described observing Mrs. Massie's eyes and noticing a slight film over the cornea, a condition that becomes

present "a few hours" after death. He also observed that blood on the victim's face was dried.

Based on these observations, his education, and his experience, Kercheval testified, over objection, that the earliest possible time of death was approximately 11:15 in the morning. The Court of Special Appeals sustained admitting this opinion as an application of Maryland Evidence Rule 5–702, dealing with testimony by experts.[2]

In this Court Massie argues that admitting the disputed opinion violated Maryland Evidence Rule 5–701, dealing with opinion testimony by lay witnesses.[3] Because the trial court ruled that Kercheval was not an expert in pathology, Massie concludes that the disputed opinion could not have been admitted under Rule 5–702 and therefore must have been admitted under Rule 5–701. Massie next submits that the disputed opinion was not based on "the perception of the witness." Md. Evid. R. 5–701; *see Robinson v. State*, 348 Md. 104, 121–27, 702 A.2d 741, 748–52 (1997) (analyzing lay opinion testimony where " 'the lay trier of facts lacks the knowledge or skill to draw the proper inferences from the underlying data.' "). Because Kercheval did not personally observe Mrs. Massie at 11:15 a.m. on February 14, 1995, Massie submits that Kercheval's opinion that she might have been dead at that time is inadmissible under Rule 5–701.

---

**2.** Rule 5–702 reads as follows:

"Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony."

**3.** Rule 5–701 reads:

"If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue."

The State, on the other hand, submits that Kercheval's opinion was admissible under either Rule 5–701 or 5–702. As we analyze the record, the disputed opinion was admissible under Rule 5–702, dealing with expert testimony, so that we need not decide whether the testimony might also have been admissible under Rule 5–701.

The distinction that the circuit court attempted to make between an opinion on the time of death and an opinion that states the outer and inner limits of a range of time during which death might have occurred is a distinction without any substantial difference. Opinions as to the time of death ordinarily do not purport to be precise, but those opinions almost universally are estimates with varying amounts of leeway. *See Wiggins v. State*, 324 Md. 551, 570, 597 A.2d 1359, 1368 (1991) ("As the trial court noted, and the record indicates, medical testimony regarding time of death is fraught with uncertainty."). It has been said that "most forensic pathologists argue that the only way to fix an accurate time of death is with a reliable witness who can say exactly when the victim took the last breath." R. Taylor, R. Bux, & D. Kirk, *Forensic Pathology in Homicide Cases*, 40 *Am.Jur. Trials* 501, 544 (1990). Although the trial court did not articulate its ultimate analysis as a change of position, as we read the record the trial court changed its mind and essentially concluded that what amounted to an opinion on the time of death was not exclusively a medical question that could be answered, on the facts presented here, only by a licensed physician. In other words, if the trial court's initial ruling was its only permissible exercise of discretion, then the change of position admitting the disputed opinion is a basis for reversal. Conversely, if the changed position of the trial court admitting the opinion was within its discretion, then there is no basis for reversal.

Existing Maryland law gives little guidance on whether a non-physician can opine on the time of death. In *New York Life Ins. Co. v. Rogers*, 156 Md. 88, 143 A. 651 (1928), the question was whether the insured under a life insurance policy had drowned before the policy was issued. Delivery of the

policy occurred on May 21, 1927, and the insured's body was found in the Baltimore Harbor on May 26, 1927. The insurer attempted to establish through the undertaker who had examined the insured's body the probable length of time that the body had been in the water. This Court sustained the trial court's rejection of the proffered opinion because there was a lack of proof that the experience of the witness in the undertaking business had "involved any observations of the effects of water, under various conditions, upon the bodies of drowned persons, as indicating the approximate time of death." *Id.* at 93, 143 A. at 653.

The statutes governing postmortem examiners indicate that lay persons, acting as investigators for and under the supervision of deputy medical examiners, may make reports which, as part of the deputy medical examiner's records, are admissible in evidence. Maryland Code (1982, 1994 Repl.Vol.), §§ 5–301 through 5–312 of the Health–General Article (HG). Each deputy medical examiner for a county must be a physician. HG § 5–306(c). Police and sheriffs are required by HG § 5–309(b) to notify the medical examiner and the State's Attorney of certain deaths, including those by violence, and to give those officials "the known facts concerning the time, place, manner, and circumstances of the death." The investigation that follows up on this notice need not be by the medical examiner personally.

> "Immediately on notification that a medical examiner's case has occurred, the medical examiner or an investigator of the medical examiner shall go to and take charge of the body. The medical examiner or the investigator shall investigate fully the essential facts concerning the medical cause of death and, before leaving the premises, reduce these facts and the names and addresses of witnesses to writing, which shall be filed in the medical examiner's office."

HG § 5–309(c). This section was amended to its present text by Chapter 839 of the Acts of 1982, the title of which in relevant part states that it was enacted "[f]or the purpose of providing that an investigator of a medical examiner may conduct an investigation in a medical examiner's case...."

Each deputy medical examiner must keep complete records on each of that official's medical examiner's cases. HG § 5–311(a)(1). These records are to include "[t]he date, cause, and manner of death" and "[a]ll other available information about the death." HG § 5–311(a)(2)(iii) and (iv). The use of these records as evidence of their contents is addressed in HG § 5–311(d) wherein the term, "record," is specially defined to exclude "a statement of a witness or other individual." HG § 5–311(d)(1)(ii). HG § 5–311(d)(2) then provides:

"A record of the office of ... any deputy medical examiner, if made by the medical examiner or by anyone under the medical examiner's direct supervision or control, ... is competent evidence in any court in this State of the matters and facts contained in it."

Under these statutes it would seem that the observations and conclusions of a non-physician investigator concerning the date, manner, and cause of death, and possibly even the time of death, can be incorporated into the official record and, in that form, be admitted into evidence. Thus there is no legislative policy limiting opinions on these matters to those expressed by a physician.

The relevant cases from other jurisdictions to which we have been referred or that our research has disclosed are relatively few. *Tope v. State*, 477 N.E.2d 873 (Ind.1985), alternatively holds that a lay coroner, the local undertaker, could not qualify as an expert witness on the time of death. *Id.* at 876. *Tope* was a post-conviction case. The coroner had not testified at the petitioner's original trial on murder charges. It was claimed the coroner's opinion, placing the death within a certain four-hour range, was newly discovered evidence. The court, however, concluded that, even if that were so, the coroner's testimony would have been limited to body warmth and loss of blood and that those contradictions of the state's case would not have altered the outcome. *Id.*[4]

---

4. Two months after *Tope* was decided, the same court decided a time of death issue in another case, without citing *Tope*. *Bieghler v. State*, 481 N.E.2d 78 (Ind.1985). In *Bieghler* the trial court found the coroner

The contrary result was reached in *State v. Mallett,* 600 A.2d 273 (R.I.1991), a murder prosecution. The witness was a Lieutenant in the Providence Fire Department who had completed the basic and intermediate courses in emergency medicine and 180 hours of training in cardiac emergency medicine. The victim had been beaten sometime after 10:00 a.m. by the accused and left in an apartment house hallway, according to an eyewitness who was a drug addict and prostitute. In an obvious effort to bolster the credibility of this eyewitness, the state called the emergency medical witness who had responded at 11:05 a.m. that same day. He was permitted to state, based on observing dilated pupils and blood which was still wet, that death occurred within fifteen minutes before his arrival and that death definitely had not occurred the previous night. The Supreme Court of Rhode Island found this opinion admissible under that state's counterpart of Rule 5–701.

That there should not be an absolute rule prohibiting nonphysician testimony as to the time of death and that the admissibility of lay testimony depends upon the facts of a particular case are well illustrated by *People v. Ramos,* 52 Cal.App.4th 300, 60 Cal.Rptr.2d 523 (1997). Ramos was convicted of first-degree burglary, one of the elements of which was that the house " 'currently [was] being used for dwelling purposes, whether occupied or not.' " 60 Cal.Rptr.2d at 524. Ramos had told the police that, after he broke into the house, he found the deceased "stiff" in bed. There was no conflicting evidence. Concluding that the house was not being used for dwelling purposes, the court reduced the conviction to second-degree burglary based on Ramos's lay testimony.

We find persuasive the analysis in *Miller v. Brass Rail Tavern, Inc.,* 541 Pa. 474, 664 A.2d 525 (1995), a wrongful death action asserting dram shop liability. On the day before his death the decedent, after consuming alcoholic beverages at

---

unqualified to opine. He was a veterinarian who had never studied fixing time of death, who stated that he was not qualified and that he did not believe in the techniques involving rectal temperature or potassium level in eyeball fluids so that he had not recorded the data needed to apply those techniques.

other locations, arrived at the defendant's tavern at about 10:30 p.m. and drank until 1:30 a.m. He was last seen alive between 2:15 and 2:30 a.m. when he dropped friends off and resumed driving his vehicle. Sometime later he was killed in an automobile accident. Time of death was relevant because the closer in time that the accident happened to the defendant's having served intoxicants to the decedent the greater was the liability exposure of the defendant. The trial court excluded an opinion on the time of death that was proffered through the lay coroner, a licensed mortician, ruling that only an individual with a medical degree could render that type of opinion. 664 A.2d at 527.

The intermediate appellate court affirmed, with a dissent. *Miller v. Brass Rail Tavern, Inc.*, 434 Pa.Super. 383, 643 A.2d 694 (1994). That court did not draw a bright line between physicians and others but held that the proponent of the evidence had failed to meet the burden of showing that the witness "had a responsible pretension to specialized knowledge in the area under investigation." 643 A.2d at 696. As that court read the record, the witness "did not explain the methodology he used, his basis of knowledge, his investigative techniques, nor his background in this area of forensics." *Id.*

The Supreme Court of Pennsylvania reversed, holding that the trial court had abused its discretion by ruling that only physicians could be competent to opine and by not permitting the proponent of the opinion to qualify the witness. *Miller*, 664 A.2d at 529. The court reviewed its general rules governing the admissibility of expert opinion evidence—rules that are quite similar to the Maryland rules reviewed, *infra*. The Pennsylvania Supreme Court was of the view, under all of the circumstances, "that a mortician of twenty seven years, duly licensed by this Commonwealth, who has also served in the dual capacity as county coroner for fifteen years, may have specialized knowledge regarding the time of death which would not otherwise be known to a lay individual." *Id.*

It is well settled in Maryland that Rule 5–702 vests trial judges with wide latitude in deciding whether to qualify a

witness as an expert or to admit or exclude particular expert testimony. *See Franch v. Ankney,* 341 Md. 350, 364, 670 A.2d 951, 957 (1996); *Hartless v. State,* 327 Md. 558, 576, 611 A.2d 581, 590 (1992); *Simmons v. State,* 313 Md. 33, 43, 542 A.2d 1258, 1263 (1988); *Franceschina v. Hope,* 267 Md. 632, 636, 298 A.2d 400, 403 (1973); *Crews v. Director,* 245 Md. 174, 178–79, 225 A.2d 436, 438 (1967). A trial judge's decision will ordinarily be reversed only if there has been an abuse of discretion. *See Franch,* 341 Md. at 364, 670 A.2d at 957; *Hartless,* 327 Md. at 576, 611 A.2d at 590.

■ The trial court is free to consider any aspect of a witness's background in determining whether the witness is sufficiently familiar with the subject to render an expert opinion, including the witness's formal education, professional training, personal observations, and actual experience. *See Manuel v. State,* 85 Md.App. 1, 22–23, 581 A.2d 1287, 1297 (1990); *Armstrong v. State,* 69 Md.App. 23, 29, 515 A.2d 1190, 1193–94 (1986); *Fitzwater v. State,* 57 Md.App. 274, 281, 469 A.2d 909, 913 (1984).

■ Time of death is a subject which courts have long recognized as an appropriate one for expert testimony. In the instant matter Kercheval's examination of the deceased's body gave him a sufficient factual basis to support opinion testimony. The trial judge concluded that Kercheval, by virtue of his experience, training, and education, had special knowledge on the subject beyond the experience of the jurors and that Kercheval's opinion would assist the jury. *See* Md. Evid. R. 5–702. We find no abuse of discretion in the trial court's reaching those conclusions.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY THE PETITIONER.