810 A.2d 36

**Philimon N. SHEMONDY,**

v.

**STATE of Maryland.**

No. 1804, Sept. Term 2001.

Court of Special Appeals of Maryland.

Nov. 1, 2002.

604

State W. McCormack, Assistant Public Defender (Stephen E. Harris, Public Defender on the brief), Baltimore, for appellant.

Rachel Marblestone Kamins, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, Baltimore, and Douglas Gansler, State's Attorney for Montgomery County of Rockville, on the brief), for appellee.

Argued before SALMON, KENNEY, and ADKINS, JJ.

KENNEY, Judge.

A jury sitting in the Circuit Court for Montgomery County convicted Philimon N. Shemondy, appellant, of possession of cocaine with the intent to distribute. The court sentenced him to fifteen years of imprisonment. Appellant presents the following questions for our consideration, which we have rephrased as follows: [1]

I.   Did the trial court err by permitting a police officer to render an expert opinion about the meaning of numerical data that were retrieved from appellant's pager?

II.  Did the trial court err by admitting into evidence the numerical data that were obtained from appellant's pager?

III. Did the trial court err by permitting the State to offer rebuttal evidence?

For the reasons stated below, we find no error and affirm the decision of the trial court.

### Factual and Procedural Background

In the evening hours of August 16, 2000, police officers from the Special Investigations Division of the Montgomery County

---

1. Appellant phrased the issues as follows:

    1. Whether the trial court erred in permitting any evidence regarding the significance of the data contained in a pager recovered from the appellant during a search incident to arrest?

    2. Whether the trial court erred in admitting improper rebuttal evidence?

Police Department conducted surveillance of a three level, garden-style apartment building located at 17116 Queen Victoria Court in Gaithersburg. The purpose of the surveillance was to serve appellant with an arrest warrant. While waiting for appellant, the police officers used radios to communicate with each other.

Shortly before 9:00 p.m., Detective John St. Louis observed appellant and Purnell Smoot walking towards the front of the apartment building. By radio, Detective St. Louis alerted the other officers of appellant's arrival and, then, all at once, the officers approached the men, shouting "county police, county police" and "get down." By this time, appellant and Mr. Smoot had entered the open stairwell of the apartment building. Upon hearing the officers' oral commands, appellant ran up the stairwell of the building and Mr. Smoot hesitated for a moment and then followed appellant.

The officers caught Mr. Smoot, but appellant continued running up the stairwell. When appellant reached the top level of the building, Detective Mark Janney observed him remove an object from the waist of his pants and then bend towards the floor as if to conceal the object. Detective Janney made this observation while standing on the sidewalk in front of the building.

After appellant discarded the object, he walked down the stairwell where he encountered Detective Charles Carafano. As Detective Carafano approached, he observed appellant throw a napkin on the floor of the stairwell. Detective Carafano then placed appellant under arrest.

Thereafter, Detectives Carafano and Janney walked to the top level of the building where they observed a large bulge under a floor mat in the area where Detective Janney had observed appellant bend over. The officers lifted the mat and discovered 25.95 grams of crack cocaine and 13.97 grams of powder cocaine. Detective Carafano also seized the napkin, which contained .26 grams of crack cocaine.

The police searched appellant and seized the following items from his pants: one Samsung cellular telephone and $70 from

the right front pocket, $104 from the right front zipper pocket, $20 from the left front pocket, and one Motorola pager from the waistband.

Detective St. Louis turned off the pager two days after appellant's arrest. On September 8, 2000, Detective St. Louis obtained a search warrant, which authorized him to retrieve numerical data from appellant's pager.

Initially, defendant was charged in the District Court of Maryland for Montgomery County with possession of cocaine with the intent to distribute and possession of cocaine. In October 2000, however, a grand jury returned a single-count indictment that charged appellant with possession of cocaine with the intent to distribute.

At trial, the State proceeded under the theory that appellant sold cocaine. To support this theory, seven police officers testified about the cocaine, cellular telephone, and pager that were seized on the night of appellant's arrest. Detective St. Louis testified about the search warrant he obtained for appellant's pager and, also, the numerical data that were retrieved from the pager. Finally, Sergeant Marcus Jones testified as an expert in drug usage and drug trafficking.

In order to qualify Sergeant Jones as an expert, the State, during *voir dire* examination, elicited the following information about his knowledge, skill, experience, training, and education. He had been a police officer with the Montgomery County Police Department for fifteen years, working in the Tactical Drug Enforcement Unit of the Special Investigations Division for nine of those years. In this capacity, he worked undercover as an investigator, participating in "hand to hand purchases with drug dealers" and obtaining information from drug dealers "on how actually they will purchase drugs, how they will cut drugs up to sell, their methods of operation, how they operated." In addition, he worked with confidential informants, learning the "street" value of drugs and how buyers and sellers used pagers and cellular telephones to communicate with each other. He also participated in the execution of nearly one hundred fifty search warrants.

Sergeant Jones received a bachelor's degree in business administration. As a police officer, he attended several schools and seminars where he learned, among other things, how to identify, package, and test drugs. The schools and seminars included a Drug Enforcement Administration school on narcotics, advanced seminars on narcotics investigations, and an Internal Revenue Service sponsored seminar on organized crime, money laundering, and narcotics.

Following this testimony, the trial court accepted Sergeant Jones as an expert in drug usage and drug trafficking. Thereafter, Sergeant Jones opined that appellant sold cocaine. In arriving at this conclusion, he relied on three factors. The first factor was the large amount of cocaine that was seized. He testified that drug users generally purchase cocaine in small quantities on a daily basis. In his experience, "[n]o user ha[d] ever told me . . . that they [would] buy this much for their own personal use."

The second factor was the money that was discovered in different pockets of appellant's pants. Sergeant Jones testified that some drug dealers "will separate their monies from what they actually make." In other words, dealers would keep money that was earned from drug sales separated from money that would be used to purchase additional drugs. Also, dealers separated money in the event of a robbery so that an "individual may not find it after going through one pocket, just grab the money and think that is all that they have."

The third factor was the numerical data that were retrieved from appellant's pager. Sergeant Jones testified that buyers and sellers of crack cocaine often use pagers to communicate with each other. A buyer will call a dealer's pager and input a telephone number followed by certain "codes." For example, if "[the buyers] were looking for . . . $50 worth [of drugs], they would put in a code [that would] say 50." Also, a buyer might use a code to identify himself or use a code like 911, "which means hurry up call me back."

Sergeant Jones then examined the numerical data that Detective St. Louis had retrieved from appellant's pager. The data were as follows:

| 528–5818 | 40 | |
| 330–1109 | 711 | |
| 528–5818 | 50 | |
| 528–5818 | 50 | |
| 869–9814 | 60 | 7589 |
| 240–632–2693 | 40 | 911 |
| 240–632–2693 | 911 | |
| 990–1819 | 40 | 911 |
| 444–0788 | | |
| 869–9814 | 80 | 7589 |
| 240–632–2693 | 40 | 911 |

Sergeant Jones explained that the data included telephone numbers that were followed by the same "codes" that he had discussed earlier. In his opinion, the data indicated that persons were contacting appellant in order to purchase crack cocaine.

The defense's theory of the case was that appellant was a drug user and that the cocaine was for his personal use. In support, Herbert Howard testified as an expert in drug addiction and drug usage. Mr. Howard, a former drug addict, was a certified chemical dependency counselor who worked for two separate substance abuse programs. He testified that the amount of cocaine that was seized could have been for personal use or for distribution. He explained that approximately five to ten percent of addicts would use a large quantity of cocaine but "it usually ha[d] to do with the amount of wealth they ha[d]." As examples, he referred to a professional football player or a person who received a tax refund or an inheritance.

## DISCUSSION

### I—Expert Testimony

Appellant argues that the trial court erred by permitting Sergeant Jones to render an expert opinion about the meaning of the numerical data that were retrieved from appellant's pager. He contends that Sergeant Jones could not render this opinion because he did not have any "specialized training or knowledge." We disagree.

During direct examination, Sergeant Jones reviewed the numerical data retrieved from appellant's pager and provided the following explanation:

[THE STATE]: Okay. Can you tell the jurors whether or not there is any significance to this [sic] data and if so, what significance is there?

[SGT. JONES]: The significance that I see in that particular data is the numbers that come directly behind the 7 digit numbers appear to be phone numbers.

[APPELLANT'S COUNSEL]: I would object [to] him interpreting that.

THE COURT: Overruled.

* * *

[SGT. JONES]: This will be, [for] example, 7 digit phone number, and the numbers here that are described here are numbers that are consistent with codes that we put in for the amounts of drugs that we want. If I was to contact a specific person or dealer stating that this is exactly how much I want.

So I will put this number, put the phone number which I was calling from and I wanted that dealer to return the call to me, then I will put 40, which will be my request for how much I will want to purchase.

And in this instance here is a specific code.

* * *

[SGT. JONES]: And this line here behind the 869 number and the 60 is an example of a typical code that we would utilize just to identify me as that particular caller.

And in this particular situation again is the phone number. It will be an area code which is consistent in this area 240, a 7 digit number again.

Here is a code specifically for the amount that you want and a 911 behind it which we find to be commonplace hurry up.

So these numbers are again typical of what we see in the drug trade as being numbers that are consistent with the amount of drugs that people would be requesting from this specific individual.

[THE STATE]: Is there anything on there that you would find inconsistent?

[SGT. JONES]: I mean there is nothing really inconsistent with any of these numbers except for example.

This is just a typical number that comes in and there is no code behind it that could be anything.

This here, 711, again could be anything. It could just be somebody's code that somebody wants them to call back but the other numbers are similarly consistent.

* * *

[THE STATE]: You indicated that this is consistent with the sale and specifically are we talking about the sale of crack?

[SGT. JONES]: Yes, in my experience specifically with the sale of crack cocaine with those particular numbers.

Generally, a trial court has "wide latitude in deciding whether to qualify a witness as an expert or to admit or exclude particular expert testimony." *Massie v. State,* 349 Md. 834, 850–51, 709 A.2d 1316 (1998); *see Hartless v. State,* 327 Md. 558, 576, 611 A.2d 581 (1992). This decision will be reversed only if there is an abuse of discretion. *Massie,* 349

Md. at 851, 709 A.2d 1316.   Maryland Rule 5–702, which addresses the admissibility of expert testimony, provides that such testimony is admissible if it will "assist the trier of fact to understand the evidence or to determine a fact in issue."

The trial court did not abuse its discretion in permitting Sergeant Jones to render an expert opinion about the meaning of the numerical data that were obtained from appellant's pager.   During the *voir dire* examination of Sergeant Jones, he testified that, while working undercover, he had paged drug dealers in order to purchase drugs.   In so doing, he used "codes" to identify himself and to indicate how much cocaine he wanted to purchase.   In addition, he had observed confidential informants, who wanted to purchase crack cocaine, contact drug dealers in the same manner.   As such, Sergeant Jones acquired special knowledge about how to use a pager to communicate with drug dealers.   Because this knowledge is not within a juror's everyday experience, his testimony would have assisted the jury in understanding the evidence.   Therefore, we conclude that the *voir dire* examination of Sergeant Jones supported the trial court's conclusion that he was qualified to render this opinion.

### II—Relevance of Information from Pager

Next, appellant contends that the trial court erred by admitting into evidence the numerical data that were retrieved from appellant's pager.   He argues that this evidence was not relevant because the State did not prove when the pages were received.   We disagree.

Maryland Rule 5–401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."   In other words, relevant evidence tends to prove or disprove a proposition in a case. *See Johnson v. State,* 332 Md. 456, 472 at n. 7, 632 A.2d 152 (1993).   A ruling on relevance is "quintessentially within the wide discretion of the trial judge." *Best v. State,* 79 Md.App. 241, 259, 556 A.2d 701,

*cert. denied,* 317 Md. 70, 562 A.2d 718 (1989). This decision will not be disturbed absent an abuse of discretion. *Best,* 79 Md.App. at 260, 556 A.2d 701.

■ This evidence was relevant. According to Sergeant Jones, the numerical data indicated that persons were contacting appellant in order to purchase cocaine. Thus, the evidence tended to prove the State's theory that appellant sold cocaine.

Also, the State did not have to prove when the pages were received in order to have this information entered into evidence. This uncertainty might relate to the weight of the evidence, not to its admissibility. It was sufficient that the State established that the pager was seized from appellant, that it was working at that time, and that Detective St. Louis had turned it off two days after appellant's arrest. The trial court did not abuse its discretion.

### III—Rebuttal Evidence

Finally, appellant argues that the trial court erred by permitting the State to offer rebuttal evidence. He asserts that the evidence did not "explain, reply, or contradict any new matter 'brought into the case by the accused.'" We are not persuaded by appellant's argument.

During its case-in-chief, the State attempted to elicit testimony from Detective St. Louis and Sergeant Jones about appellant's neighborhood. On both occasions, appellant's counsel objected and the trial court did not permit the testimony. At one of the bench conferences concerning this testimony, the State explained that, based on a prior conversation with appellant's expert witness, it anticipated that the witness would testify that "people of extremely significant financial resources" would possess, for personal use, the amount of cocaine that was seized in this case. As a result, the State wanted to establish that appellant did not live in an affluent neighborhood. In response, the trial court stated: "Maybe you better save that for rebuttal."

Appellant called Herbert Howard to testify as an expert in drug addiction and drug usage. During direct examination,

Mr. Howard testified that a drug addict could use 40 grams of cocaine in one day. He stated, however, that this amount of cocaine was not necessarily consistent with personal use because it depended on the individual. Specifically, he testified as follows:

[APPELLANT'S COUNSEL]: So based on what you were saying, a person certainly could do 40 grams of cocaine a day—in a day?

[MR. HOWARD]: A person could do 40 grams. Is that the—I would say that's within the 10—5 to 10 percent. If you've got a hundred percent of cocaine addicts, I would say that between the 5 and 10 percent would be somebody that would cop in that quantity and use it continuously—

[APPELLANT'S COUNSEL]: Okay.

[MR. HOWARD]:—and it usually has to do with the amount of wealth they have. Some of the more famous cases that have come out, a guy from the Cowboys has wrote [sic] a book about it. He put in the book that he would—you know, they would get a hotel room and they would buy two or three ounces and they'd stay in there—two or three of them would stay in there and smoke it until it was all gone.

During cross-examination, the State questioned Mr. Howard about the correlation between wealth and the amount of cocaine a person might possess at one time. The following colloquy occurred:

[THE STATE]: Your definition of wealthy—I don't think you have given us a definition, but isn't it fair to say that you believe wealthy is the people that live in the big homes in Potomac and Chevy Chase?

[MR. HOWARD]: I still think you are trying to twist what I am going to say, but if I can answer the question more than yes or no, I'll answer it.

THE COURT: Why don't you go ahead and answer it.

[MR. HOWARD]: Okay. Wealthy, yes, people that have large homes, not necessarily Potomac, but anywhere else, anybody that, you know, is making six figures or more is

what I would consider wealthy, and it would be easier for them to buy some quantity on a regular basis, but then you also [sic] the individual who gets income tax checks back, you get the individuals that will inherit $5,000.00 and a coke fiend will go out and buy that kind of a quantity.

So it's—really, yes, on a regular basis, yes, but if a person that does cocaine comes into a sum of money, they would be very, very apt to go out and buy that kind of drugs with it.

That would be pennies from heaven, you might say.

In its rebuttal case, the State offered the testimony of Detective St. Louis to establish that appellant did not live in an affluent neighborhood. Over appellant's counsel's objection, the trial court permitted this testimony, stating: "I think the door was opened, at the very least, by Mr. Howard's testimony, and I don't think it is going to be prejudicial given the issue in this case."

Rebuttal evidence " 'explains, or is a direct reply to, or a contradiction of, any new matter that has been brought into the case by the defense.' " *State v. Hepple,* 279 Md. 265, 270, 368 A.2d 445 (1977)(quoting *Mayson v. State,* 238 Md. 283, 289, 208 A.2d 599 (1965)); *see Kulbicki v. State,* 102 Md.App. 376, 383, 649 A.2d 1173 (1994), *cert. denied,* 337 Md. 706, 655 A.2d 911 (1995). It is within the sound discretion of a trial court to determine what constitutes rebuttal evidence. *State v. Booze,* 334 Md. 64, 68, 637 A.2d 1214 (1994). This determination will be reversed only if it is "manifestly wrong and substantially injurious." *Mayson,* 238 Md. at 289, 208 A.2d 599 (1965).

The testimony of Detective St. Louis was proper rebuttal evidence because it "replied to" new matter that had been "brought into the case by" appellant. The issue in this case was whether appellant possessed the cocaine for personal use or for distribution. To this end, Mr. Howard testified that 40 grams of cocaine could have been consistent with personal use. He qualified this remark, however, by stating that the amount of cocaine used by a person depended, in part, upon "the amount of wealth they ha[d]." He stated that wealth

could be derived from employment, i.e., "anybody that ... is making six figures," or from a windfall like a tax refund or an inheritance. This correlation between "wealth" and the amount of cocaine that a person possessed was "new matter" introduced by appellant. As such, it was within the sound discretion of the trial court to permit the State to present rebuttal evidence that appellant did not live in an affluent neighborhood. That decision was not manifestly wrong.

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**