803 A.2d 1034

**Garrett Eldred WILSON,**

v.

**STATE of Maryland.**

**No. 19, Sept. Term, 2001.**

Court of Appeals of Maryland.

Aug. 5, 2002.

John L. Kopolow, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for petitioner.

Steven L. Holcomb, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Maryland, on brief), Baltimore, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

RAKER, Judge.

The primary question we address in this appeal is whether the trial court abused its discretion in permitting the State to use statistical data and a product rule computation to prove the improbability of two Sudden Infant Death Syndrome ("SIDS")[1] deaths in a single family. We shall hold that because the evidence did not satisfy the test we adopted in *Reed v. State*, 283 Md. 374, 391 A.2d 364 (1978), which guides the admissibility of expert testimony in Maryland, the trial court abused its discretion in admitting the evidence.

---

1. In 1989, the National Institute of Child Health and Human Development published the following definition of Sudden Infant Death Syndrome (SIDS):

 "The sudden death of an infant under 1 year of age, which remains unexplained after a thorough case investigation, including performance of a complete autopsy, examination of the death scene, and review of the clinical history."

 M. Willinger et al., *Defining the Sudden Infant Death Syndrome (SIDS): Deliberations of an Expert Panel Convened by the National Institute of Child Health and Human Development*, 11 PEDIATRIC PATHOLOGY 677 (1991). *See also State v. Aten*, 130 Wash.2d 640, 927 P.2d 210, 220 (1996).

Garrett Eldred Wilson, petitioner, was convicted by a jury in the Circuit Court for Montgomery County of first degree premeditated murder of his infant son, Garrett Michael Wilson. He was sentenced to a term of imprisonment of life without the possibility of parole. The Court of Special Appeals affirmed his conviction. *Wilson v. State*, 136 Md.App. 27, 764 A.2d 284 (2000).

We granted Wilson's petition for writ of certiorari to consider the following questions:

"1. May the State use statistical data and a product rule computation to prove the improbability of two SIDS deaths in a family where such evidence lacks an adequate foundation and is highly susceptible to misuse by the jury?

2. Did the trial judge take inadequate corrective action when the State's Attorney argued to the jury that a statistical computation he performed accurately represented the 1 in 10 million probability of petitioner's innocence?

3. May State experts in forensic pathology tell the jury that they drew incriminatory inferences from the defendant's purchase of life insurance on his infant children and that they made credibility assessments of witnesses in the case?

4. Did the trial judge err in prohibiting the defense pathologist from explaining why, in his opinion, the defendant's purchase of life insurance on his children is irrelevant to an expert pathologist's opinion as to matter of death?

5. Did the trial judge err in admitting evidence of Appellant's alleged murder of his infant daughter six years before the alleged murder in this case?"

*Wilson v. State*, 363 Md. 662, 770 A.2d 169 (2001).

## I.

On February 25, 1981, Deborah Oliver Fennell, then petitioner's wife, gave birth to a daughter, Brandi Jean Wilson. After Brandi's birth, petitioner purchased two life insurance policies, worth a total of $40,000, on Brandi's life. Petitioner was the primary beneficiary of these policies, Ms. Fennell the

contingent beneficiary. On April 30, 1981, Brandi died. After an autopsy, her death was labeled as a SIDS death.

On March 22, 1987, Mary Anastasi, petitioner's wife as of March 1986, gave birth to a son, Garrett Michael Wilson. After Garrett's birth, petitioner purchased two life insurance policies, worth a total of $150,000, on his son's life. As with his daughter Brandi's insurance policies, petitioner was the primary beneficiary and his wife the contingent beneficiary. On August 13, 1987, Garrett died. After an autopsy, his death was also attributed to SIDS.

On May 28, 1998, the Grand Jury for Montgomery County indicted petitioner for the murder of Garrett Michael Wilson. Wilson proceeded to trial before a jury in the Circuit Court for Montgomery County.

At trial, Ms. Fennell testified that the night Brandi died was the first and only night that petitioner took care of the child. Soon after Brandi's death, petitioner filed claims with the two insurance companies from which he had purchased the policies on Brandi's life, and he collected the insurance proceeds. Like Ms. Fennell, Ms. Anastasi testified that the night of Garrett's death was the first night that petitioner alone took care of their baby. Petitioner collected the money from insurance policies he had taken out on Garrett's life soon after the infant's death.

At trial, the State presented testimony from the doctors who performed autopsies on Brandi and Garrett. Dr. Ann Dixon performed the autopsy on Brandi. Dr. Dixon testified that she changed her opinion as to the cause of death in Brandi's case to "probable suffocation" and the manner of death to "undetermined" on the basis of information provided by the police, including witnesses' statements and information about the life insurance policies on the two children taken out by petitioner.

Dr. Charles Kokes performed the autopsy on Garrett. He testified that he changed his opinion as to the cause of death in Garrett's case to smothering and the manner of death to homicide. Dr. Kokes changed his opinion based on additional

investigative information provided by the State, including the facts surrounding Brandi's death and interviews with Garrett's mother.

Dr. John Smialek, the chief medical examiner for the State of Maryland, reviewed the original autopsy reports on Brandi and Garrett. In addition, the State provided Dr. Smialek with statements by the children's parents, family friends, and information regarding the life insurance policies. Dr. Smialek changed his opinion as to the cause of death in Brandi's case to suffocation and the manner of death to undetermined. Focusing largely on swelling in Garrett's brain, Dr. Smialek changed his opinion in Garrett's case to suffocation and the manner of death to homicide.

Dr. Linda Norton did not conduct the autopsy on Brandi or Garrett. She was hired by the State to review the children's deaths. Dr. Norton concluded that the cause of death in Brandi's case should be changed to suffocation and the manner of death to homicide. She focused on the similarity between Brandi and Garrett's deaths and pictures that suggested Brandi's face was pushed into the mattress of her crib. Dr. Norton also concluded that the cause of death in Garrett's case was suffocation and that the manner of death was homicide. Her opinion was based on the fact that petitioner was caring for both children at the time they died, and that these occasions were the only times petitioner had cared for either child during the night. She also considered statements from Garrett's mother and the insurance policies taken out by petitioner.

Two of the experts, Dr. Kokes and Dr. Norton, also relied on statistics, utilizing the product rule,[2] as a basis for their opinion and in calculating the probability that Garrett had not

---

2. We discuss the product rule in Section II. In general terms, the product rule has been defined as follows: that "the probability of the joint occurrence of a number of *mutually independent* events is equal to the product of the individual probabilities that each of the events will occur." *People v. Collins,* 68 Cal.2d 319, 66 Cal.Rptr. 497, 438 P.2d 33, 36 (1968) (emphasis in original).

died of SIDS. Dr. Kokes testified that "[t]he death rate from Sudden Infant Death Syndrome back in 1987 was somewhere between 1 to 2 deaths for every 1,000 live births."[3] He also noted that Garret had cerebral swelling, a condition that effects less than one percent of children who die from SIDS. Employing the product rule, Dr. Kokes multiplied the probability of a child's dying of SIDS and the probability of a SIDS death involving cerebral swelling. He concluded that the "the mathematical possibility of having a SIDS death occurring with cerebral swelling would be 1 in 100,000 live births." Dr. Kokes then took into account the fact that Garrett was the second child in the family to die of SIDS. He multiplied the probability of Garrett's dying from SIDS, 1 in 100,000, by the probability of Brandi's dying of SIDS, 1 in 1,000. He concluded that the probability that Garrett died from SIDS was 1 in 100,000,000.

Dr. Norton also testified as to the probability that Garrett died of SIDS. Dr. Norton relied on different statistics that indicated that SIDS occurs in 1 infant out of every 2,000 live births.[4] Dr. Norton employed the product rule and concluded

---

**3.** Dr. Kokes testified that this figure was drawn from ARMED FORCES INSTITUTE OF PATHOLOGY, HISTOPATHOLOGY ATLAS FOR SUDDEN INFANT DEATH SYNDROME (1993). He also specified that he was testifying as to statistics on Caucasian children (both Brandi and Garrett were Caucasian) and that the statistics were relevant to the time period when Garrett died.

**4.** Dr. Norton testified as to the source of her statistics as follows:
"The figure that I use . . . is derived from the statistics that are coming out of what I consider to be good medical examiner's offices, where the criteria—where the minimum criteria are adhered to.

So that I know that the child at least has been autopsied; that the child is not of an inappropriate age, you know, 12 months, 15 months, something of that nature; that toxicology of a reasonable nature has been done; that microscopic examination has been done; and that we can be reasonably assured that at least the death does fall within what is supposed to be the rules, as it were, before you can call a death SIDS.

\*　　\*　　\*

So, the information or the statistic that I use is one that is generally accepted as that which is produced by a good medical examiner system."

that the probability of two SIDS deaths occurring in one family is 1 in 2,000 multiplied by 1 in 2,000, or 1 in 4,000,000.

Petitioner moved *in limine* to exclude the expert testimony regarding the probability that a single family would suffer two SIDS deaths as well as the evidence that he was involved in Brandi's death. The trial judge denied both motions.

During rebuttal closing argument, the State's Attorney referred to the statistics that the experts relied on in forming their opinion that Garrett's death was criminal homicide, and argued the probability of petitioner's innocence. The State's Attorney did not merely argue that there was a low probability that two SIDS deaths would occur in one family; he argued that there was a low probability that petitioner was innocent. He told the jury, "[i]f you multiply his numbers, instead of 1 in 4 million, you get 1 in 10 million that the man sitting here is innocent. That was what a doctor, their expert, told you." Defense counsel's motion for a mistrial was denied and, instead, the court gave a curative instruction.

## II.

We turn first to petitioner's argument that the trial court erred in admitting expert testimony that relied on the product rule to calculate the probability that petitioner's children died of SIDS. It is the general rule that the admissibility of expert testimony is within the sound discretion of the trial judge and will not be disturbed on appeal unless clearly erroneous. In this regard, the trial judge has wide latitude in determining whether expert testimony is sufficiently reliable to be admissible. *See In Re Adoption/Guardianship No. CCJ14746*, 360 Md. 634, 759 A.2d 755 (2000). Maryland Rule 5–702, addressing the admissibility of expert testimony, provides that such testimony is admissible "if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." Testimony concerning an unreliable scientific process, technique or unreliable opinion is of little value to a jury.

In *Reed v. State*, 283 Md. 374, 391 A.2d 364 (1978), this Court adopted the standard set forth in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), for determining the admissibility of scientific evidence and expert testimony. *See Reed*, 283 Md. at 389, 391 A.2d at 372. Writing for the Court, Judge Eldridge noted that prior to the admission of expert testimony based on the application of new scientific techniques, it must be first established that the particular scientific method is itself reliable. *Reed*, 283 Md. at 380, 391 A.2d at 367. Where the validity and reliability of a scientific technique is so broadly and generally accepted within the scientific community, as is the case of ballistic tests, blood tests, and the like, a trial court may take judicial notice of its reliability. *Id.* Likewise, a court may take judicial notice that certain procedures, widely recognized as bogus or experimental, are unreliable. *Id.* When the reliability of a particular technique is not subject to judicial notice, however, "it is necessary that the reliability be demonstrated before testimony based on the technique can be introduced into evidence. Although this demonstration will normally include testimony by witnesses, a court can and should also take notice of law journal articles, articles from reliable sources that appear in scientific journals, and other publications which bear on the degree of acceptance by recognized experts that a particular process has achieved." *Id.* The Court concluded that the proper test for establishing the reliability of scientific opinion is whether the basis of the opinion is generally accepted as reliable within the expert's particular scientific field. *Reed*, 283 Md. at 381, 391 A.2d at 368.[5]

---

5. Appellate review of a trial court's decision regarding admissibility under *Frye–Reed* is *de novo*, as both petitioner and the State concede. The contours of appellate review were cogently discussed in *Jones v. United States*, 548 A.2d 35 (D.C.1988), where the Court of Appeals of the District of Columbia reviewed a number of cases, including this Court's decision in *Reed*. The court found:

"General acceptance means just that; the answer cannot vary from case to case. For this reason, when the ... *Frye* test ... is at issue, it becomes the 'threshold question' of admissibility, to be resolved as a

 The question of whether *Frye–Reed* applies to the use of statistics arose in *Armstead v. State*, 342 Md. 38, 673 A.2d 221 (1996). We held there that the *Frye–Reed* test applies where the proper choice of statistical technique depends upon the applicability of an underlying scientific phenomenon or principle. *Id.* at 80 n. 33, 673 A.2d at 242 n. 33. We reasoned as follows:

> "The *Frye–Reed* test often will not apply to statistical calculations because the choice between alternative statistical techniques, although subjective, is often merely a choice between equally valid methods of describing the same underlying scientific data. Statistics are inherently flexible, and thus there are usually multiple correct statistics that can be used to describe the same set of data. Statisticians routinely make choices in presenting data; for example, they may choose to present either the mean, the median, or

---

matter of law before the court exercises its discretion in applying all the criteria to a particular proffered expert:

> The question of the reliability of a scientific technique or process is unlike the question, for example, of the helpfulness of particular expert testimony to the trier of facts in a specific case. The answer to the question about the reliability of a scientific technique or process does not vary according to the circumstances of each case. It is therefore inappropriate to view this threshold question of reliability as a matter within each trial judge's individual discretion.

*Reed v. State*, 283 Md. 374, 391 A.2d 364, 367 (1978). But more succinctly 'courts should not subsume the question of qualifying the [scientific] process ... under the question of qualifying the expert.' *People v. Law*, 40 Cal.App.3d 69, 75, 114 Cal.Rptr. 708, 711 (1974). It follows that, in evaluating whether a scientific technique has gained general acceptance, appellate courts review the trial court's analysis de novo. *See, e.g., id.; Reed*, 283 Md. 374, 391 A.2d at 377; *Commonwealth v. Lykus*, 367 Mass. 191, 327 N.E.2d 671, 675 (1975); *see also Addison*, 162 U.S.App.D.C. at 202–03, 498 F.2d at 744–45; *United States v. Brown*, 557 F.2d 541, 557 (6th Cir.1977); *see generally* Giannelli, *The Admissibility of Novel Scientific Evidence: Frye v. United States, a Half–Century Later*, 80 COLUM. L. REV. 1197, 1222–23 (1980); Case Comment, *Evidence: Admissibility of Spectrographic Voice Identification*, 56 MINN. L. REV. 1235, 1245 (1972)."

548 A.2d at 40. *See also* F. MURPHY, MARYLAND EVIDENCE HANDBOOK § 1406, at 553 (3d ed.1999) ("[i]f the trial judge admits the [expert testimony], the appellate court also may independently apply the *Reed–Frye* test).

the mode to describe the "center" of a data set. This type of format choice is not subject to *Frye–Reed* analysis. There are, however, instances, as in this case, where the proper choice of statistical techniques is dependent on an underlying scientific phenomenon or principle. For example, suppose that a new species of flower is discovered. When it is discovered, a white-flowered variety and a red-flowered variety are observed. It would be incorrect to calculate the probability of a new plant having white flowers based on a normal distribution, because this would depend on whether flower colors varied along a continuum from white to pink to red, or whether there were only discrete possibilities for the flower color, *i.e.*, white or red. *See* R. FREUND & W. WILSON, STATISTICAL METHODS 65–66, 70–76. Under this scenario, the correct choice of probability calculations would depend on the underlying genetics of the plant."

*Armstead,* 342 Md. at 80 n. 33, 673 A.2d at 242 n. 33. Thus, before a scientific expert opinion may be received in evidence, the basis of that opinion must be shown to be generally accepted as reliable within the expert's particular scientific field.

A brief discussion of SIDS and the product rule is helpful in understanding how *Frye–Reed* applies to the case before us. Approximately fifty years ago, the medical community began a search to understand and prevent SIDS. *See* Committee on Child Abuse and Neglect, *Distinguishing Sudden Infant Death Syndrome From Child Abuse Fatalities,* 107 PEDIATRICS 437 (2001). Today, understanding of the etiology of SIDS still is incomplete. SIDS remains a "diagnosis of exclusion," meaning that a "diagnosis of SIDS reflects the clear admission by medical professionals that an infant's death remains completely unexplained." *See id.*

Medical studies consistently have identified the following risk factors for SIDS: prone sleep position, sleeping on a soft surface, maternal smoking during pregnancy, overheating, late or no prenatal care, young maternal age, prematurity and/or

low birth weight, and male sex. *See* Task Force on Infant Positioning and SIDS, *Changing Concepts of Sudden Infant Death Syndrome: Implications for Infant Sleeping Environment and Sleep Position,* 105 PEDIATRICS 650 (2000). African Americans and American Indians have consistently higher rates, two to three times the national average. *Id.* Because the cause of SIDS remains unknown, none of those risk factors are of help in calculating the probability that a child will die of SIDS. Robert M. Reece, *Fatal Child Abuse and Sudden Infant Death Syndrome: A Critical Diagnostic Decision,* 91 PEDIATRICS 423 (1993).

Beyond these commonly accepted risk factors, there is little agreement as to the causes of SIDS. This is particularly true with regard to the role of genetics. Some, including the State, argue that it is generally accepted that there is no genetic defect or condition that can be tied to SIDS. *See id.* (noting that "[t]he issue of recurrent SIDS within a family raises the possibility of genetically determined conditions.... But when SIDS occurrences among siblings of SIDS cases were compared with those among non-SIDS siblings in maternal age—and birth rank matched—control families, there was no statistically significant difference in SIDS rates.... Thus, the notion that having a SIDS baby makes having another more likely was dispelled.").

In contrast, a recent article in the Journal of the American Medical Association presents a study suggesting that SIDS may result from a genetic condition. *See* Michael J. Ackerman et al., *Postmortem Molecular Analysis of SCN5A Defects in Sudden Infant Death Syndrome,* 286 JAMA 2264 (2001).[6]

---

**6.** The authors explained the context for their study as follows:

"Despite numerous hypotheses for the causes of SIDS ... the pathophysiological mechanisms responsible for SIDS remain poorly understood.... Investigators have postulated that ventricular arrhythmias and the congenital long QT syndrome (LQTS) may be responsible for some cases of SIDS. Clinically, LQTS affects approximately 1 in 5000 individuals.... Long QT syndrome presents with syncope, seizures, or sudden death if the LQTS substrate degenerates into a polymorphic ventricular tachyarrhythmia (*torsade de pointes*). Long QT syn-

This study draws into question the assertion that SIDS deaths within a single family are independent or unrelated events. Similarly, in the March 2000 edition of *Pediatrics,* the Task Force on Infant Positioning and SIDS, chaired by John Kattwinkel, M.D., expressed uncertainty as to the risk of SIDS among siblings. The report noted:

"Several studies that have evaluated SIDS among siblings have found that having a sibling who died of SIDS is a significant risk factor. However, others have failed to find such a relationship or have shown that siblings of infants who have died of SIDS are at risk for all causes of infant death, not just SIDS. In addition, most of the studies reporting familial SIDS have the limitation of having been conducted during a period when case and scene investigations were not routine and assignment of the SIDS diagnosis may have been flawed. Thus, the true risk is unknown."

John Kattwinkel, et al., *Changing Concepts of Sudden Infant Death Syndrome: Implications for Infant Sleeping Environment and Sleep Position,* 105 PEDIATRICS 650 (2000). In addition, the recent discovery of a deficit in a serotonergic pathway in the brainstem has provided promising insight into the mechanisms responsible for SIDS. *Id. See also,* HC Kinney et al., *Medullary Serotonergic Nework Deficiency in the Sudden Infant Death Syndrome,* 60 J. NEUROPATHOL. EXP. NEUROL. 228 (2001); A. Panigraphy et al., *Decreased Serotonergic Recepter Binding in Rhombic Lipderived Regions of*

---

drome is a primary cardiac channelopathy with 6 identified chromosomal loci and 5 cardiac ion channel genes implicated. Defects in the cardiac sodium channel gene (SCN5A) account for approximately 5% to 10% of LQTS and individuals with SCN5A mutations have an increased risk of cardiac events during sleep."

Michael J. Ackerman et al., *Postmortem Molecular Analysis of SCN5A Defects in Sudden Infant Death Syndrome,* 286 JAMA 2264 (2001). The authors concluded:

"Approximately 2% of this prospective, population-based cohort of SIDS cases had an identifiable SCN5A channel defect, suggesting that mutations in cardiaction channels may provide a lethal arrhythmogenic substrate in some infants at risk for SIDS."

*Id.*

*the Medulla Oblongata in the Sudden Infant Death Syndrome*, 59 J. NEUROPATHOL. EXP. NEUROL. 377 (2000).

With this background in mind, we now turn to the product rule. The product rule "states that the probability of the joint occurrence of a number of *mutually independent* events is equal to the product of the individual probabilities that each of the events will occur." *People v. Collins*, 68 Cal.2d 319, 66 Cal.Rptr. 497, 438 P.2d 33, 36 (1968) (emphasis in original). *See also Armstead*, 342 Md. at 69–70, 673 A.2d at 236 (noting that the product rule is a probability principle that establishes that "the probability of two events occurring together is equal to the probability that event one will occur multiplied by the probability that event two will occur."). In *Armstead*, we explained that "[t]he classic illustration is coin tossing; the probability of finding heads on two successive coin tosses is equal to the probability of heads on the first toss, 50%, times the probability of heads on the second toss, 50%, equaling 25%." *Id.* at 70, 673 A.2d at 236. We noted that the product rule may be applied only to events that are unrelated to one another, or are independent. We explained:

"In the coin toss example, this means that the outcome of the first coin toss does not affect the outcome of the second coin toss, which is a valid assumption. By comparison, assume we wish to calculate the probability of having both a checking account and a loan from a particular bank. This is an example of non-independent or linked events. We can not calculate the probability of having both a loan and a checking account at the same bank by multiplying together the individual probabilities under the product rule because a person is more likely to obtain a loan from the bank where he maintains a checking account. To illustrate nonindependence as it applies to human characteristics (although not genetic characteristics), assume we wish to determine the probability a man will have both a beard and a moustache. Also assume that the probability of having a beard is $\frac{1}{20}$, and the probability of having a moustache is $\frac{1}{10}$. It would be incorrect to infer that the probability of having both a beard and a moustache, applying the product rule, is $\frac{1}{200}$, because

it is likely that these are non-independent events; men who have beards are probably more likely than others to also have moustaches."

*Id.* at 70, 673 A.2d at 236 (citations omitted).

In the case *sub judice*, petitioner contends that the product rule should not have been used to calculate the likelihood that both of his children died of SIDS because it is not generally accepted in the medical field that SIDS deaths within a single family are independent. The State argues that the statistical evidence introduced at trial was generally accepted and reliable, and further, that because the risk factors for SIDS are independent, it was appropriate for the experts to utilize the product rule and to multiply the probability of one child dying of SIDS times the probability of a second child also dying of SIDS. The State posits that it is accepted universally that SIDS is not caused by any genetic defect, and that the testimony based on the product rule was therefore permissible. The State relies heavily on the conclusion of the Court of Special Appeals that SIDS deaths are independent events. The Court of Special Appeals reasoned as follows:

"[W]e merely note that appellant's argument that SIDS deaths are interrelated is not totally accurate. It is accurate to assert that the deaths labeled as SIDS deaths may indeed have a connection. The inaccuracy arises once that connection is discovered, because the deaths should no longer be identified as SIDS deaths. We must keep in mind that SIDS is a diagnosis of exclusion that is subject to change if an actual cause is uncovered. The scientific literature has shown that, from what is currently known, SIDS risk factors are not interrelated but are independent. This is particularly true of multiple SIDS deaths in one family, where the likelihood of recurrence is less than one percent."

*Wilson,* 136 Md.App. at 70, 764 A.2d at 307 (citing Catherine L. Goldenberg, Comment: *Sudden Infant Death Syndrome as a Mask for Murder: Investigating and Prosecuting Infanticide,* 28 Sw. U.L.Rev. 599, 606 (1999)).

The State and the Court of Special Appeals cite articles that suggest that there is no genetic component to SIDS. Both fail to acknowledge that most of the articles reflect that it is *unknown* whether there is a genetic component to SIDS.[7] For example, the intermediate appellate court cited the Task Force on Infant Positioning and SIDS, *Changing Concepts of Sudden Infant Death Syndrome: Implications for Infant Sleeping Environment and Sleep Position,* 105 PEDIATRICS 650 (2000), for the proposition that SIDS deaths are independent. *Wilson,* 136 Md.App. at 69, 764 A.2d at 306. The court omitted the author's discussion of genetics as a risk factor:

> "Several studies that have evaluated SIDS among siblings have found that having a sibling who died of SIDS is a significant risk factor. However, others have failed to find such a relationship or have found that siblings of infants who have died of SIDS are at risk for all causes of infant death, not just SIDS. In addition, most of the studies reporting familial SIDS have the limitation of having been conducted during a period when case and scene investigations were not routine and assignment of the SIDS diagno-

---

7. A strong argument that there is no genetic component to SIDS is found in the article by Robert M. Reece, *Fatal Child Abuse and Sudden Infant Death Syndrome: A Critical Diagnostic Decision,* 91 PEDIATRICS 423 (1993). The author states:

 "The issue of recurrent SIDS within a family raises the possibility of genetically determined conditions. It also provokes questions of a forensic nature. In a 14–year study of subsequent siblings of SIDS victims in Norway, and in a Washington State study over 16 years, the SIDS sibling risk was seen to be almost four times that of the SIDS risk among births at large. But when SIDS occurrences among siblings of SIDS cases were compared with those among non-SIDS siblings in maternal age- and birth rank-matched control families, there was no statistically significant difference in SIDS rates or in total infant mortality rates in families with a history of SIDS compared with families with no SIDS. Thus, the notion that having a SIDS baby makes having another more likely was dispelled. With the exclusion from the SIDS statistics of some of the deaths now thought to be due to inborn errors of metabolism, the chances for subsequent SIDS in families seems even less likely."

 As demonstrated above, few authors in this area exhibit such confidence that there is no genetic component to SIDS.

sis may have been flawed. *Thus, the true risk is unknown.*"

*Id. (emphasis added).* The Court of Special Appeals also relied on a student note for the proposition that multiple SIDS deaths in single family are unrelated. *Wilson,* 136 Md.App. at 70, 764 A.2d at 304 (quoting Goldenberg, Comment: *Sudden Infant Death Syndrome as a Mask for Murder: Investigating and Prosecuting Infanticide,* 28 Sw. U.L.Rev 599, 606 (1999)).[8]

We hold that the trial court erred in admitting expert testimony based on the product rule because a condition necessary to the proper application of the product rule was lacking: there was inadequate proof of the independence of Brandi and Garrett's deaths. As evidenced by the authorities above cited, there is not general agreement in the scientific community as to the relationship between SIDS deaths within a single family. Stated another way, there is not general agreement in the medical community that multiple SIDS deaths in a single family are genetically unrelated. The literature continues to reflect a lively debate concerning the role of genetics in SIDS. Moreover, the recent study in the Journal of the American Medical Association suggests that there may well be a genetic component to SIDS. *See* Michael J. Ackerman et al., *Postmortem Molecular Analysis of SCN5A Defects in Sudden Infant Death Syndrome,* 286 JAMA 2264 (2001). If there is any consensus in the field, it is that more research into the question is necessary before general acceptance is reached. One article, which is reflective of thinking in the field, states:

"The extent to which the risk of SIDS is increased in subsequent siblings of a prior SIDS victim has been a subject of active debate. A ten-fold increase in United States SIDS rates in subsequent siblings was initially re-

---

**8.** Both the State's brief before this Court and the Court of Special Appeals' opinion omit the designation "Comment" in the citation of this student note, thereby failing to indicate that it is a student-written piece. *See* The Bluebook. A Uniform System of Citation R. 16.6.2(a), at 121 (Columbia Law Review Ass'n et al. eds., 17th ed.2000) (noting that signed and titled notes, comments, projects, etc. are cited in the same manner as any other signed article in a law review, *except that the designation of the piece should appear before the title of the work to indicate that it is student-written* ).

ported, and an 18% SIDS rate was reported among 27 infants with at least two prior SIDS events in siblings. A report from Norway indicated a 3.7 times greater SIDS incidence in subsequent siblings. A subsequent United States study found a four-fold increase but attributed this to increased parity and maternal age. Taking the average of these and other studies, the increased risk of SIDS in subsequent siblings is about five-fold; assuming a SIDS risk of $^{1.3}/_{1000}$ live births in the United States, then subsequent siblings have about a 0.65% risk of also dying of SIDS. This relationship was further confirmed in an analysis of the SIDS rate in prior siblings of SIDS victims; Beal *et al.*, reported a relative risk of 6.8 for SIDS in prior siblings compared with controls, and a comparable rate has been reported in twins. It is also important to note that the risk for infant death from causes other than SIDS also increases about six-fold in siblings of a prior SIDS victim; because many of the epidemiological risk factors for SIDS and other causes of infant mortality are identical, it has not been possible to determine whether increased infant mortality in subsequent siblings of prior SIDS victims relates to biological and/or to epidemiological risk factors. Regardless of cause, however, the important question is thus not whether infant mortality increases in subsequent siblings of prior SIDS victims, but what are the biological and/or epidemiological mechanisms?"

Carl E. Hunt, *Sudden Infant Death Syndrome and Subsequent Siblings*, 95 PEDIATRICS 430 (1995). *See also* Committee on Child Abuse and Neglect, *Distinguishing Sudden Infant Death Syndrome From Child Abuse Fatalities*, 107 PEDIATRICS 437 (2001) (noting that "[d]espite extensive research, understanding of the etiology of SIDS remains incomplete").

 In light of the widespread disagreement as to the causes of SIDS, we are unable to find general acceptance of the notion that there is no genetic component to SIDS. Unanimity is not required for general acceptance, *see State v. Copeland*, 130 Wash.2d 244, 922 P.2d 1304, 1319 (Wa.1996), but it is clear to us that a genuine controversy exists within

the relevant scientific community. In sum, there was inadequate proof of the statistical independence of SIDS deaths within a single family. Therefore, based on the current state of medical opinion, the product rule should not be employed in calculating the likelihood of multiple SIDS deaths within a single family. *See People v. Collins*, 68 Cal.2d 319, 66 Cal. Rptr. 497, 438 P.2d 33, 39 n. 14 (1968) (noting that "the multiplication rule cannot be used without some degree of error where the traits are not independent").

The State argues that error, if there be any, was cured by the trial court's jury instruction on the use of statistics. In this regard, the court instructed the jury as follows:

"During this trial, you have heard testimony regarding statistical probabilities. Certain experts in rendering their opinions relied in part on the statistical probabilities of a SIDS death occurring twice within the same family.

You may consider this testimony only in evaluating the weight to be given to those opinions. The weight of the evidence does not depend on the number of witnesses on either side."

The instruction did not, in any way, communicate to the jury that the experts' calculations may have been based on a theory that is not commonly accepted in the relevant scientific community. The instruction therefore failed to alleviate any of the dangers that arise when jurors are left to assess scientific evidence that is not generally accepted.

As a fall back position, the State argues harmless error. Two of the State's four expert witnesses testified that the chances of two SIDS deaths in one family were infinitesimal. Dr. Kokes testified that there was one chance in 100,-000,000 that two babies of a single family would die of SIDS, where one has brain edema. He characterized these odds as "so low [as] to make it impossible." Dr. Kokes also testified that absent these statistics, his characterization of Garrett's death would have changed. Dr. Norton testified that the chance of SIDS occurring twice in the same family is one in

4,000,000. She also testified that the statistics contributed to her conclusion that Garrett's death was a homicide.

In *Reed,* we noted that "[l]ay jurors tend to give considerable weight to 'scientific' evidence when presented by 'experts' with impressive credentials." *Reed,* 283 Md. at 386, 391 A.2d at 370 (quoting *People v. Kelly,* 17 Cal.3d 24, 130 Cal.Rptr. 144, 549 P.2d 1240, 1245 (1976)). The case sub judice was based entirely on circumstantial evidence. In light of the role the statistics, and particularly the product rule, played in the expert's testimony, we are unable "to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict." *Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665, 678 (1976). The error was not harmless. Accordingly, we find that the trial committed reversible error in admitting the statistical calculations based on the product rule. Inasmuch as the other matters raised on appeal by petitioner may come up again at any new trial, for the guidance of the trial court, we shall comment upon petitioner's remaining contentions.

### III.

■■■ Petitioner argues that the trial court took inadequate corrective action when the State's Attorney, in closing argument, calculated the statistical probability of petitioner's innocence. Prior to closing arguments, the court reviewed proposed jury instructions with counsel. The State's Attorney desired a particular instruction to guide the jury's consideration of the statistical evidence.[9] The following discussion ensued:

"STATE'S ATTORNEY: *I mean we shouldn't stand up . . . and say there is a one–in–200–million chance that this man is innocent. We shouldn't be able to say that.* What we

---

9. The court instructed the jury as follows:

"During this trial, you have heard testimony regarding statistical probabilities. Certain experts in rendering their opinions relied in part on the statistical probabilities of a SIDS death occurring twice within the same family. You may consider this testimony only in evaluating the weight to be given to those opinions."

should be able to say is—and this limits it. . . . 'Ladies and gentlemen, Dr. Kokes thinks that the chances of SIDS happening the second time is one in 200 million. And you— that is the only purpose for which we can argue and for which they can consider. They can't and shouldn't be able to perhaps—

COURT: And you are afraid they are going to misuse that evidence.

STATE'S ATTORNEY: They might. And if this instruction is given—and the jurors are presumed to follow the Court's instructions—then there could be no prejudice inured from the use of statistics at all during the course of this trial, because the only purpose for the statistics to be introduced was to assist—was because the medical experts relied on those statistics."

Despite his knowledge that he was prohibited from using the statistics to calculate the probability of petitioner's innocence, the State's Attorney argued, in closing, as follows:

"But what he also told you in terms of the statistics we have talked about, the doctors, relying on the statistics of SIDS, he told you that in his numbers that it was 3 in 1,000 certain SIDS deaths.

The second time, the death could be attributed to SIDS. There is 3 in 1,000 live births that would be a SIDS. Well, let us use his numbers and be conservative.

Assuming it is 3 in 1,000 for the first. He also told you that less than 1 percent of SIDS deaths had the brain swelling, the edema.

*If you multiply his numbers, instead of 1 in 4 million, you get 1 in 10 million that the man sitting here is innocent.* That was what a doctor, their expert, told you."

Petitioner moved for a mistrial on the grounds that the State improperly used the statistical evidence to calculate the probability that petitioner was innocent. The court denied the motion, and petitioner requested a curative instruction. Defense counsel stated: "I would ask you to . . . tell [the jury] that you can disregard it. You can never ever, ever, use

statistics and compare that to the burden of proof or reasonable doubt. They have no place in this case, and that is what I am asking." The court declined to instruct the jury as requested by defense counsel and, instead, essentially reiterated the earlier instruction.

The State's Attorney's comment constituted error.[10] The statistics stated by the experts in this case were admitted as evidence to satisfy the State's burden that Garrett's death was a homicide, *not* that petitioner was the person who committed the homicide. The State's Attorney, however, improperly used the statistics to argue that there was only a minuscule possibility that the defendant was innocent. The State's Attorney was well aware that the statistical evidence could not be used to calculate the probability of petitioner's innocence. The colloquy at the bench makes this crystal clear. His argument was improper.

The courts that have considered this issue have concluded that it is impermissible to assign a number to the probability of guilt or innocence. *See e.g., People v. Collins,* 68 Cal.2d 319, 66 Cal.Rptr. 497, 438 P.2d 33, 40 (1968). In *Collins,* the Supreme Court of California stated:

"Confronted with an equation which purports to yield a numerical index of probable guilt, few juries could resist the temptation to accord disproportionate weight to that index; only an exceptional juror, and indeed only a defense attorney schooled in mathematics, could successfully keep in mind the fact that the probability commuted by the prosecution can represent, *at best,* the likelihood that a random couple would share the characteristics testified to by the People's witnesses—*not necessarily the characteristics of the actually guilty couple.*"

10. The Court of Special Appeals found the State's Attorney's argument "perplexing and disturbing," *Wilson,* 136 Md.App. at 73, 764 A.2d at 309, but held that the improper remark was not so egregious as to have undermined the presumption that appellant was innocent. *Id.* at 78, 764 A.2d at 311.

*Id. See also United States v. Massey,* 594 F.2d 676, 681 (1979) (finding that "[b]y using such mathematical odds the prosecutor 'confuse[d] the probability of concurrence of the identifying marks with the probability of mistaken identification' "); Charles McCormick, McCormick on Evidence 810 (John W. Strong ed., 5th ed.1999); Annotation, *Admissibility, in Criminal Case, of Statistical or Mathematical Evidence Offered for Purpose of Showing Probabilities,* 36 A.L.R.3d 1194 (1971). Other courts have addressed the impact of probability statistics upon the jury. In *State v. Harbold,* 124 Ill.App.3d 363, 79 Ill.Dec. 830, 464 N.E.2d 734 (1984), the court stated:

> " 'Testimony expressing opinions or conclusions in terms of statistical probabilities can make the uncertain seem all but proven, and suggest, by quantification, satisfaction of the requirement that guilt be established 'beyond a reasonable doubt.' We believe that testimony to statistical probabilities encouraged the jury to disregard evidential risks traditionally weighed in determining guilt or innocence, and focused unfairly upon a numerical conclusion. As such, we find that the testimony violated one of the primary requirements of expert opinion, that the opinion be an aid to the jury. In light of the closeness of this circumstantial case, we cannot say that this improper testimony, which gave a false impression of precision in the measurement of guilt, did not affect the jury's deliberations."

*Id.,* 79 Ill.Dec. 830, 464 N.E.2d at 749 (quoting *State v. Carlson,* 267 N.W.2d 170, 176 (Minn.1978)) (citations omitted).

▬▬▬ In general, counsel are permitted wide latitude in closing arguments. Counsel may comment on matters in evidence and any reasonable inferences to be drawn therefrom. Arguments that diminish the presumption of innocence, however, are not permitted. It is self-evident that an attorney may not argue inferences that are improper or are not warranted by the evidence.[11]

---

11. ABA Standards for Criminal Justice· Prosecution Function and Defense Function § 3–5.8 (3d ed.1993) provides, in relevant part: "(a) In closing argument to the jury, the prosecutor may argue all reasonable infer-

■ Moreover, the trial judge's supplemental instruction did not cure the prejudice caused by the State's Attorney's remark. The instructions directed the jurors to use the statistical evidence only to evaluate the expert's testimony, but, given the powerful nature of statistics, did nothing to cure the prosecutor's invitation to misuse the evidence to conclude that there was a 1 in 10,000,000 chance that petitioner was innocent. The trial court's instructions did not cure the prejudice the State's comment engendered.

■ We now address petitioner's argument that the trial court abused its discretion in prohibiting the defense pathologist from testifying as to retail practices in the life insurance industry. The trial judge sustained the State's objection that Dr. Jones, the defense pathologist, was not qualified to testify as to statistics concerning the number of people who purchase life insurance on their children.[12]

■ Under Maryland Rule 5–702, the trial judge:

"shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience or training or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony."

Trial judges have "wide latitude in deciding whether to qualify a witness as an expert or to admit or exclude particular expert testimony." *Massie v. State,* 349 Md. 834, 850–51, 709 A.2d 1316, 1324 (1998). The record supports the trial judge's ruling that Dr. Jones was not qualified as an expert in the insurance industry and was not competent to express an opinion as to what percentage of the population buys life insurance on

---

ences from evidence in the record. The prosecutor should not intentionally misstate the evidence or mislead the jury as to the inference it may draw."

12. Petitioner's defense counsel proffered at the bench that Dr. Jones knew of a study from a company in Connecticut which apparently found that 22 or 23% of parents purchased infant life insurance.

infants. The trial judge did not abuse her discretion in excluding the testimony.

We turn next to petitioner's contention that the trial court erred in admitting evidence of the alleged murder of his infant daughter, Brandi, six years before the alleged murder in this case. The State sought a pre-trial ruling regarding the admissibility of evidence related to Brandi's death. The court considered certain exhibits introduced by the State, facts agreed to by both parties as uncontested and the arguments of counsel. In a memorandum opinion and order, the trial court ruled that the evidence was admissible.

Before this Court, petitioner argues that the evidence of Brandi's death was inadmissible other crimes or bad act evidence under Md. Rule 5–404(b) because it lacked special relevance, there was not clear and convincing evidence of his involvement in Brandi's death, and the probative value of the evidence was outweighed by unfair prejudice. The State argues that the evidence was admissible on several bases—for identity, motive, absence of accident and intent. The State maintains that petitioner's involvement in Brandi's death was established by clear and convincing evidence, and that the probative nature of the evidence outweighed the prejudice.

We shall not address this issue because in light of our ruling as to the expert's reliance on the product rule, it is unclear what the substance of the testimony will be in any future proceeding. The expert testimony on the cause and manner of Brandi's death will bear on the determination of whether her death is viewed properly as a prior bad act and, consequently, whether the admissibility of evidence surrounding her death is subject to Maryland Rule 5–404(b). The expert testimony will also affect if, and how, the evidence of Brandi's death may be used to prove the *corpus delicti.*[13]

---

13. The evidence relating to Brandi's death was admitted to establish the *corpus delicti* of the crime, as well as to establish petitioner as the criminal agent. Before this Court, neither party presented any argument on the question of whether "other crimes evidence" and the like is admissible to prove the *corpus delicti.* For discussion of the issue, *see,*

For all the reasons stated herein, the judgment of conviction is reversed.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AND REMAND THE CASE TO THE CIRCUIT COURT FOR A NEW TRIAL. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.*

Concurring Opinion by HARRELL, Judge.

I join in the judgment based solely on the discussion in Part III of the opinion regarding the prosecutor's prejudicial error in commenting on the statistical probability of innocence.

---

*e.g., United States v. Woods,* 484 F.2d 127 (4th Cir.1973); EDWARD J. IMWINKELRIED, UNCHARGED MISCONDUCT EVIDENCE § 6:04 (1995).