893 A.2d 1169

**John Paul THOMPSON**

**v.**

**STATE of Maryland.**

**No. 2783, Sept. Term, 2004.**

Court of Special Appeals of Maryland.

March 2, 2006.

514

Nigel L. Scott (Scott & Yallery-Arthur, on brief), Washington, DC, for appellant.

Mary Ann Ince (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellee.

Panel DAVIS, EYLER, DEBORAH S., and BARBERA, JJ.

EYLER, DEBORAH S., J.

John Paul Thompson, the appellant, was convicted by a jury in the Circuit Court for Montgomery County of attempted robbery with a dangerous weapon, use of a handgun in a crime of violence, and three counts of first-degree assault. He was sentenced to a total of six years' imprisonment and five years of probation.[1]

The appellant presents three questions for review, which we have combined and rephrased:

I. Did the trial court err in granting the State's motion to exclude DNA evidence?

II. Did the trial court err in granting the State's motion to exclude his expert witness on eyewitness identification? [2]

---

1. The sentence was as follows: 15 years' imprisonment on one charge of assault (count 4), with all but six years suspended; 15 years' imprisonment on the attempted robbery charge (count 1), with all but five years suspended, to run concurrent with count 4; 15 years' imprisonment for each of the other two charges of assault (counts 2 and 3), with all but five years suspended, to run concurrent to the above counts; and 15 years' imprisonment on the use of a handgun charge (count 5), with all but five years suspended, to run concurrent to the above counts.

2. The issues as posed by the appellant are:

I. Whether the Court's refusal to permit the Defendant to introduce exculpatory DNA evidence was an error and an abuse of discretion?
II. Whether the state's untimely notice to the Defendant of the results of the DNA tests on the handgun resulted in prejudice to the Defendant and a denial of his right to due process?

For the following reasons, we shall reverse the judgments of the circuit court and remand the case to that court for a new trial.

## FACTS AND PROCEEDINGS

On March 18, 2004, the appellant was indicted on the five above-mentioned charges. The charges stemmed from an attempted robbery of the Gourmet Grog store ("the Grog") in Gaithersburg on October 18, 2003, at approximately 9:30 p.m.

The appellant was tried by a jury for six days, from September 7 to 14, 2004. The State called as witnesses in its case-in-chief Minesh and Rekha Patel; James L. Brown, Jr.; Karl Doepel; Officer John Panetti; Sergeant Tomas Rodea; Officer Paul Bandholz; Sergeant Paul Liquorie; Detective Frank Colbert; Detective Darren Francke; Tom Burse; and Detective Debra Haba. The detectives and officers were from the Montgomery County Police Department ("MCPD").

The State's evidence showed the following. The Grog is a beer, wine, and deli shop. At the time of the attempted robbery, it was owned by the Patels. The Patels were present and working at the Grog when the attempted robbery took place. They were the only people in the Grog when the robber entered the store.

The robber was wearing black pants and a black shirt. He had a black T-shirt tied around his face and head as a mask, with only his eyes and the bridge of his nose exposed. He was wearing a black bandana around his head. He was not wearing gloves.

Mr. Patel testified that he immediately recognized the robber as a regular customer of the Grog. When the robber entered the Grog, Mr. Patel said, "What's going on, buddy?" The robber pointed a 25–caliber semiautomatic handgun at Mr. Patel and "click[ed] it" twice. He then approached Mr.

---

III. Whether the Court erred and abused its discretion by disallowing the introduction of the testimony of an expert on eyewitness identification?

Patel, grabbed him by the neck, and said, "Give me the money." Mr. Patel responded that he did not have the money. The robber then walked over to the cash register, where Mrs. Patel was sitting. She stood up and he aimed the gun at her.

At that point, the robber's mask fell part-way down, exposing the side of his face. He retied the mask to cover his face.

Mrs. Patel opened the cash register but never handed the robber any money.

Mrs. Patel testified that she, too, immediately recognized the robber as a regular customer of the Grog.

Both of the Patels identified the appellant in court as the robber. They testified that, before the attempted robbery, Mrs. Patel had nicknamed him "Boo," and that he had been at the Grog two days before the day of the crime.

The State's evidence further showed that, as the attempted robbery was unfolding, a woman walked by the Grog and noticed what was happening. She ran into Ernie's Pub, a bar next door to the Grog, and yelled for someone to call the police. The bartender did so. Brown, who was inside Ernie's and also was a regular customer of the Grog, ran over to the Grog and went inside. The robber pointed the gun at Brown, then placed it to his temple and told him to get on the ground. Brown told the robber he was leaving, and the robber hit him in the temple with the gun. When he did that, Brown grabbed the robber's arm and a struggle ensued, during which Brown managed to grab the gun from the robber. The robber fled the Grog on foot.

Doepel, a friend of Brown, also was inside Ernie's Pub at the time. He heard the woman yell, and then heard from someone in the bar that Brown had run over to the Grog. Doepel ran toward the Grog. As he did so, he saw a man he believed to be the robber running down the street. He ran after the man to see whether he was going to get inside a car. When the man ran down a path, Doepel stopped following him for fear of being "ambushed."

Several police officers from the MCPD responded to the Grog. Sergeant Rodea was the first to arrive. As he approached the Grog, he saw a black male subject, fitting the broadcast description of the robber, coming from the direction of the Grog. He stopped the subject, who then was released after Brown looked at him and said he was not the robber.

Officer Panetti arrived on the scene and, after speaking with Sergeant Rodea, entered the Grog. Brown told him what had happened and handed him the gun he had taken from the robber, which he had put in his pants pocket. Officer Panetti handed the gun to Sergeant Rodea, who was off duty at the time, who gave the gun to Officer Bandholz. Officer Bandholz "made the gun safe" and gave it back to Sergeant Rodea, who put it in a plastic bag and gave it to Officer Liquorie. None of the officers who handled the gun were wearing gloves.

Sergeant Rodea, Officer Banhloz, and Sergeant Liquorie viewed footage of the attempted robbery taken by a television surveillance camera inside the Grog. They testified that the footage showed the robber enter the Grog and strike someone behind the counter with a gun. Another man entered the store and began fighting with the robber on the ground. The robber crawled toward the door. He had trouble opening the door, and touched it several times before fleeing the store.[3]

Sergeant Liquorie interviewed the Patels, Brown, and Doepel at the scene. They described the robber as a black male, in his early twenties, six feet tall, with a thin build. Mrs. Patel did not tell the sergeant at that time that the robber was a regular customer. Mr. Patel said that the robber had an American or possibly African accent. He also did not say that the robber was a regular customer.

Sergeant Liquorie requested testing for DNA and latent fingerprints on the gun. He also requested elimination buccal swabs from Mrs. Patel and Brown, but not from any of the officers.

---

3. By the time of the trial, this surveillance tape was no longer available, and therefore could not be put into evidence.

Detective Colbert dusted the door for fingerprints. He was able to lift 11 prints from the interior and exterior of the door. The police never found a clip, bullets, or shell casings.

The appellant went to the Grog on three occasions following the attempted robbery: October 24, 29, and 30, 2003. The Patels recorded by television surveillance his activity inside the store. They did not call the police on any of those occasions. They gave the surveillance footage to the investigating police officers.

Sometime during the first week in November 2003, Detective Haba received that footage. She met with Mr. Patel and viewed it with him. He pointed to the appellant on the film and said he was the person who had tried to rob the Grog. On November 17, 2003, Detective Haba conducted a search of the appellant's house, with the consent of his girlfriend. She found some dark-colored clothing in a laundry basket in his bedroom.

On December 11, 2003, Detective Haba showed Mrs. Patel a photographic array. Mrs. Patel chose the appellant's picture from the array. Detective Haba also showed the array to Brown and Doepel. Brown could not identify anyone as the robber. Neither could Doeple, but he mentioned that a person in the array, who was not the appellant, had the same shaped face as the robber.

Detective Haba testified that she did not ask any of the officers who handled the gun to submit elimination DNA samples because of the time and expense that would have been involved.

The appellant submitted a DNA swab.

Tom Burse, a certified latent print examiner for the MCPD, examined the fingerprint evidence in this case. A fingerprint lifted from the interior of the Grog door matched that of the appellant. Only two of the prints had "something of value." The other print was not the appellant's and could not be identified.

The defense called Tanya Thompson, the appellant's mother; Walter Arango, a friend of the appellant; and Gwendolyn Ward, the appellant's girlfriend, who testified that she was with him at home at the time of the attempted robbery. The State then called Detective Patrick Word as a rebuttal witness.

On September 14, 2004, the appellant was found guilty of all charges.

On September 22, 2004, the appellant filed a motion to set aside the verdict and for a new trial. He argued that the trial court had erred by granting motions by the State to preclude him from calling a witness to testify about the DNA evidence and to preclude him from calling an expert witness on eyewitness identification. The appellant asserted that the State's motion to exclude the DNA evidence was untimely. He also argued that, by granting the State's motion to exclude his expert witness on eyewitness identification, the court deprived him of his right to effective assistance of counsel and to a fair trial.

The State responded that the issues were not appropriate for a motion for a new trial.

On October 27, 2004, the court denied the appellant's motion for new trial.

After sentencing, the appellant noted a timely appeal.

## DISCUSSION

### I.

 Carrie Tentarsky, a forensic chemist with the MCPD, performed a DNA analysis on the gun and wrote a DNA analysis report of her findings. The DNA analysis excluded the appellant's DNA from being on the gun. Several other DNA samples were found on the gun, but were not identified. According to the testimony of Detective Haba, the DNA analysis report was complete and in the custody of the MCPD on February 10, 2004.

On the fifth day of trial, after calling his last witness but before resting the State's case, the prosecutor moved *in limine* to preclude the defense from calling Tentarsky as a witness and from introducing her DNA analysis report into evidence. He argued that the defense did not comply with Md.Code (1973, 2002 Repl.Vol.), section 10–915 of the Courts & Judicial Proceedings Article ("CJP"), which he interpreted to require a party to give written notice to the other party at least 45 days before trial of the party's intent to introduce DNA evidence.

The prosecutor represented to the trial court that the State's Attorney's Office did not receive the DNA report from the MCPD until July 31, 2004, and that defense counsel was furnished the report on August 2, 2004. The prosecutor further represented that he received a letter, dated August 19, 2004, from defense counsel, stating that the defense intended to introduce the DNA evidence at trial. The prosecutor did not respond to that letter.

The prosecutor argued that, because defense counsel did not give 45–days written notice, prior to trial, of her intention to use the DNA evidence, or ask for a continuance, the DNA evidence, including Tentarsky's testimony, should be excluded. The prosecutor further argued that the State's case would be prejudiced if the DNA evidence were admitted because he did not have time to take DNA samples from the police officers who handled the gun, to determine if their DNA matched the unidentified DNA samples found on the gun.

Defense counsel responded that she could not give 45–days notice of her intention to use the DNA evidence at trial because the prosecutor did not give the DNA analysis report to her more than 45 days before trial. She argued that she gave the prosecutor written notice as soon as she could, by means of her August 19 letter, and that the prosecutor should have known when he received the DNA analysis report that the defense was going to introduce the evidence at trial. Defense counsel further argued that she would have asked for a continuance if the prosecutor had told her, before the start

of the trial, that he was moving *in limine* to exclude the DNA evidence. Defense counsel maintained that the appellant would be prejudiced if the DNA evidence were excluded, not only because the evidence was exculpatory, but also because she had told the jury in opening statement that the DNA evidence would be admitted and had questioned some of the State's witnesses about DNA evidence.

The court granted the State's motion *in limine*. It ruled that CJP section 10–915 mandates a party seeking to introduce DNA evidence at trial to give the other party at least 45–days notice and, when that is not done, the court lacks discretion to admit the evidence. The judge explained that he read the language of CJP 10–915(c) to require that 45–days written notice be given, and that "the [c]ourt doesn't have any discretion to [ignore the rule]." He observed, the statute "just doesn't give [the court] the ability to do it at all." The court noted that "the middle of a trial" was not the appropriate time to argue about why the statute was not complied with.

On appeal, the appellant contends the trial court erred in granting the State's motion to exclude Tentarsky's testimony and her DNA analysis report from evidence. Specifically, he asserts that the trial court had discretion to admit the evidence, even though 45–days notice was not given, because he was unable to give 45–days notice due to the State's tardiness in furnishing the DNA test results to the defense. He asserts that the proper remedy under the statute was not to exclude the evidence, but to continue the case. He maintains that, because the State did not object at a time when the case could be continued, the trial court erred in granting the State's motion.

The State responds that the trial court did not err in granting its motion to exclude the DNA testimony and evidence. Preliminarily, it argues that the appellant failed to preserve this issue for review because the trial court did not finally rule on it and the appellant did not request a ruling on it. On the merits, the State argues that it was incumbent

upon the defense, not the State, to request a continuance so that it could comply with the 45-day requirement.

■ The issue is preserved for our review. The State is correct that, at the end of the hearing on the State's motion, the trial judge stated, "we'll deal with that when it comes up." Further review of the transcript reveals, however, that, after testimony by the first defense witness, the court ruled on the State's motion, granting it.

CJP section 10–915, entitled "Admissibility of DNA profiles," provides in pertinent part:

(c) *Purposes.*—In any criminal proceeding, the evidence of a DNA profile is admissible to prove or disprove the identity of any person, if the party seeking to introduce the evidence of a DNA profile:

(1) Notifies in writing the other party or parties by mail at least 45 days before any criminal proceeding; and

(2) Provides, if applicable and requested in writing, the other party or parties at least 30 days before any criminal proceeding with:

(i) First generation film copy or suitable reproductions of autoradiographs, dot blots, slot blots, silver stained gels, test strips, control strips, and any other results generated in the course of the analysis;

(ii) Copies of laboratory notes generated in connection with the analysis, including chain of custody documents, sizing and hybridization information, statistical calculations, and worksheets;

(iii) Laboratory protocols and procedures utilized in the analysis;

(iv) The identification of each genetic locus analyzed; and

(v) A statement setting forth the genotype data and the profile frequencies for the databases utilized.

(d) *Prerequisites.*—If a party is unable to provide the information required under subsection (c) of this section at least 30 days prior to the criminal proceedings, the court may grant a continuance to permit such timely disclosures.

We agree with the appellant that the trial court erred in granting the State's motion *in limine,* for two reasons.

First, the plain language of CJP section 10–915(c) does not mandate, absolutely, that the party seeking to introduce DNA evidence give the other party 45–days notice of such. The subsection does not use directory language such as "shall" or "must" and does not spell out that in all circumstances 45–days notice is required. Rather, the 45–day notice is listed as one of several conditions precedent to the admissibility of DNA evidence. A rational reading of this language is that, when, without fault of his own, it is impossible for the party seeking to introduce the DNA evidence to comply with the 45–day notice period, substantial compliance will suffice. *See Moore v. Norouzi,* 371 Md. 154, 807 A.2d 632 (2002) (when the purpose of the statute is fulfilled, and notice is, in fact, proved, substantial compliance with a condition precedent is sufficient); *see also Rios v. Montgomery County,* 157 Md.App. 462, 852 A.2d 1005 (2004), *aff'd,* 386 Md. 104, 872 A.2d 1 (2005); *DeReggi Constr. Co. v. Mate,* 130 Md.App. 648, 747 A.2d 743 (2000).

Here, the State was at fault for failing to furnish the DNA evidence to the defense in a timely fashion. That fault, and not any fault on the part of the appellant or defense counsel, made it impossible for the defense to comply with the 45–days notice condition. The appellant in fact gave the State actual notice of his intention to use the DNA evidence at trial by defense counsel's August 19 letter. That letter was furnished about three weeks before trial, in time for the State to prepare for the introduction of the evidence or to seek a continuance if additional time was needed to prepare. We hold that, under these circumstances, the appellant substantially complied with the 45–days notice condition in CJP section 10–915(c).

Second, the State waived its right to move to preclude the appellant from calling Tentarsky as a witness and from introducing her DNA analysis into evidence.

Under subsection (d), a party who is unable to comply with the disclosure requirements of subsection (c)(2) may seek a

continuance, which the court "may grant." Here, because the State did not give the DNA evidence to the defense until less than 45 days before the trial date, the appellant could not comply with subsection (c)(1). Compliance with subsection (c)(1) is a prerequisite to being able to comply with subsection (c)(2). So, the appellant was unable to comply with both subsections (c)(1) and (2). The remedy under subsection (d) in that circumstance is that the defense may move for a continuance and the court is to exercise its discretion and grant a continuance if appropriate.

The State did not make its motion *in limine* before the trial, when the court would have been in a position to rule on a request for a continuance. *See Hill v. State,* 355 Md. 206, 220, 734 A.2d 199 (1999) (appellate court may find a motion for mistrial unpreserved when untimely made after jury retires, especially if it finds that a curative instruction would have cured any prejudice and the motion is "made too late for the court conveniently to give such an instruction"). Instead, the State waited until its case-in-chief was about to close. The State's untimely motion prevented the appellant from moving for a continuance at a time when one could be granted and prevented the trial court from exercising its discretion to grant the defense a continuance, rendering subsection (d) of the statute a meaningless remedy.

The State was well aware before trial that the appellant was going to use the DNA evidence in his defense. It did not respond before trial to defense counsel's letter stating her intention to use the DNA evidence. Moreover, the trial transcript reflects that the parties understood that the appellant intended to introduce the DNA evidence. The State did not object when defense counsel made reference to the DNA evidence in her opening statement and in her cross-examination of the State's witnesses. Indeed, the prosecutor also made reference to the DNA evidence in her opening statement and on direct examination of certain witnesses.

The State may not lead the defense to believe that there is no objection to the introduction of DNA evidence, and to rely

on that evidence as a defense through most of the trial, and then move to exclude the evidence half-way through the trial. *See Faith v. Keefer*, 127 Md.App. 706, 736 A.2d 422 (1999) (a claim that the trial court should have excluded belated discovery materials was without merit when party seeking to exclude discovery appeared to acquiesce to a departure from the scheduling order).

■ For the reasons we have discussed, the trial court had discretion to rule the DNA evidence admissible. "[T]he actual failure to exercise discretion" when the court indeed has discretion to do so "is an abuse of discretion." *Gray v. State,* 368 Md. 529, 565, 796 A.2d 697 (2002). Accordingly, we shall reverse the judgments of the circuit court and remand the case to that court for a new trial.[4]

## II.

The appellant next contends that the trial court erred in granting the State's pretrial motion to exclude the testimony of Dr. Soloman M. Fulero, an expert on witness identification. He argues that Dr. Fulero would have testified to the factors important for the jury to consider in evaluating the strength of the eyewitness identifications by the Patels, and would have explained to them the difference between certainty and accuracy of an eyewitness identification. He also notes that the court permitted Sergeant Liquorie to testify about his experience with eyewitnesses.

The State responds that the trial court correctly granted its motion to exclude the testimony of the Dr. Fulero. Specifically, it argues that the trial court did not abuse its discretion in granting the motion and finding that the jurors did not need expert testimony on the manner of evaluating eyewitness testimony.

---

4. Because of our resolution of this issue on statutory waiver grounds, it is unnecessary to decide the appellant's argument that the trial court's grant of the State's motion to exclude the DNA evidence violated his due process rights.

Because of our resolution of the first issue in the appellant's favor, it is not necessary to decide whether the trial court erred in granting the State's motion to exclude the expert testimony on eyewitness identification. We note only that such a decision is within the sound discretion of the trial court. *Wilson v. State*, 370 Md. 191, 803 A.2d 1034 (2002); *see* Rule 5–702.

**JUDGMENTS REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR FURTHER PROCEEDINGS. COSTS TO BE PAID BY MONTGOMERY COUNTY.**